**Maria M. AGOSTO, Luz M. Camacho, Virginia Diaz, Vicente Vazquez Castro and Miguel A. Vega, Plaintiffs,**

**v.**

**Awilda APONTE ROQUE, individually and as Secretary of the Department of Education of the Commonwealth of Puerto Rico, and Maria P. Scott, individually and as Regional Director of the Department of Education of the Commonwealth of Puerto Rico, Defendants.**

Civ. No. 85–0916 (JP).

United States District Court, D. Puerto Rico.

March 19, 1986.

Pedro Miranda Correa, San Juan, Puerto Rico, for plaintiffs.

José Hamid Rivera, Saldaña, Rey, Morán & Alvarado, Santurce, Puerto Rico, for defendants.

## OPINION AND ORDER

PIERAS, District Judge.

This is an action for injunctive relief and damages brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, where plaintiffs alleged violation of their constitutional rights to freedom of belief and association and to due process under the law. This Court has jurisdiction over the subject matter of the complaint under 28 U.S.C. Section 1331 and 1343(3) and (4).

A non-jury trial was held on December 16, 17 and 18, 1985, where both parties presented their witnesses and submitted documentary evidence.[1] Upon conclusion of the trial, the parties submitted the case to this Court for adjudication. Based on the evidence submitted by the parties and after due deliberation, this Court now makes the following Findings of Fact and Conclusions of Law.

## A. FINDINGS OF FACT

1. All five plaintiffs, María M. Agosto, Luz M. Camacho, Virginia Díaz, Vicente Vázquez Castro, and Miguel A. Vega, are career public employees of the Department of Education of the Commonwealth of Puerto Rico.

2. Defendant Awilda Aponte Roque is, and was at the time of the action that gave rise to the complaint, the Secretary of the Department of Education of the Commonwealth of Puerto Rico.

3. Defendant Maria Scott Morales is, and was at the time of the actions which gave rise to the complaint, the Regional Director of the Humacao Region of the

Department of Education of the Commonwealth of Puerto Rico, and was the direct supervisor of all five plaintiffs as career public employees of the Department of Education.

4. All five plaintiffs are members of the New Progressive Party (hereinafter NPP), and their political affiliation was well known in the community and by co-workers in the Department of Education. The NPP lost the general elections held in Puerto Rico on November 6, 1984, and the control of the Executive Branch of the Commonwealth Government, which it held for the previous eight years.

5. Both defendants are members of the Popular Democratic Party (hereinafter PDP), the political party whose candidate, Rafael Hernández Colón, was elected Governor of the Commonwealth of Puerto Rico in the general elections held on November 6, 1984, and who at present holds said office. Awilda Aponte Roque was appointed Secretary of the Department of Education after Governor Rafael Hernández Colón had taken office as Governor of the Commonwealth of Puerto Rico on January 2nd, 1985. María P. Scott Morales was appointed to her position as Director of the Humacao Region of the Department of Education by Awilda Aponte Roque after the latter had been appointed Secretary of the Department of Education. Defendant María P. Scott has been a candidate for public office in the Popular Democratic Party ticket. Also, Scott was Popular Party majority leader of the City of Yabucoa Municipal Assembly.

6. The NPP advocates statehood for Puerto Rico and the PDP advocates the status of a Commonwealth (Estado Libre Asociado) or, as the term is literally translated, a free associated state.

7. Both defendants knew, at the time of the actions which gave rise to the complaint, that all five plaintiffs were members of the New Progressive Party. In addition, defendant Awilda Aponte Roque had actual

---

1. Plaintiff Luz Camacho's Motion Requesting Preliminary Injunction was withdrawn and never acted upon. The trial was held on the request for permanent injunction and damages.

knowledge of the actions taken by her subordinate, defendant María P. Scott against all plaintiffs as detailed below.

8. Plaintiff María M. Agosto has been a career public employee with the Department of Education during the last twenty-five (25) years. She has done post-graduate studies and has attained a Master's Degree in Education. Her first position was as Elementary School teacher and through the years she rose through the position of Curriculum Designer, Elementary School Director, Assistant Superintendent, and Superintendent of Schools, until in 1978 she attained her present position of Regional Assistant Director of Humacao Regional Office.

9. Plaintiff Luz M. Camacho has been a career public employee with the Department of Education during the last twenty-six (26) years. She has done post-graduate studies and has attained a Master's Degree in Education. Her first position was as an Elementary School Teacher and through the years she rose through the positions of Elementary School Director, Assistant Superintendent and General Supervisor I, until in 1983 she attained her present position as General Supervisor of School Services V in the Humacao Regional Office.

10. Plaintiff Virginia Díaz has been a career public employee with the Department of Education during the last thirty two (32) years. She has done post-graduate studies and has attained a Master's Degree in Public Health Education. Her first position was as an Elementary School Teacher and through the years she rose through the position of Elementary School Teacher, Secondary English Teacher, Health Zone Supervisor, Elementary English Teacher, and Assistant School Superintendent, until in 1983 she attained her present position as General Supervisor of School Services III in the Humacao Regional Office.

11. Plaintiff Vicente Vázquez Castro has been a career employee with the Department of Education during the last twenty-two (22) years. He has done post-graduate studies and has attained a Mas-

ter's Degree in Education. His first position was as an Elementary School Teacher and through the years he rose through the positions of Elementary English Teacher, Secondary English Teacher, Elementary School Principal, Secondary School Principal and Assistant Superintendent, until in 1984 he attained his present position as General Supervisor of School Services V in the Humacao Regional Office.

12. Plaintiff Miguel A. Vega Díaz has been a career employee with the Department of Education during the last twenty-eight (28) years. He has done post-graduate studies and has a Master's Degree in School Administration and Supervision. His first position was as an Elementary School Teacher and through the years he rose through the positions of Elementary School Principal, and School Superintendent until in 1984 he attained his present position as General Supervisor of School Services in the Humacao Regional Office.

13. All the plaintiffs attained higher level positions through competitive procedures for each level, having taken examinations, having been selected from among other candidates due to their qualifications, and having passed a two-year probationary period.

14. Defendant María P. Scott became Humacao Regional Director on January 14, 1985, and all plaintiffs were her subordinates. Within four days of her appointment, Scott had taken away the duties and responsibilities of all five plaintiffs, assigning said duties to personnel in the Region who are members of the Popular Democratic Party and who were in lower positions than plaintiffs.

15. Defendant María P. Scott did not meet or consult with plaintiffs prior to taking away their duties, even though plaintiffs were in fact the senior staff in the Humacao Region. Plaintiff María Agosto was the Assistant Regional Director and, as such, second only to the Regional Director, Mrs. Scott, while the other four plaintiffs occupied the third echelon in the Region, below Mrs. Scott and Mrs. Agosto, but above the rest of the personnel.

16. Upon being relieved of their duties, plaintiffs requested from defendant Scott that she inform them of the reason for her actions, whereupon Mrs. Scott told them generally that the Popular Democratic Party had won the elections and that because of that, there had to be changes in the Region. She stated that there had been a political change in the government in November 1984 and therefore, changes had to take place in all aspects. Plaintiffs then requested a meeting with Mrs. Scott to discuss the taking away of their duties. Said meeting was to be held on January 22, 1985, but when plaintiffs arrived, Mrs. Scott refused to meet with them alone, insisting that if there was to be a meeting, it had to be with the attendance of Mrs. Aida Marcano, Mrs. Nydia Prestamo, Mrs. Lydia Cruz, Mr. Luis Meléndez, Mr. Jesus Molinari, Mr. Joel Díaz and Mr. Jorge Príncipe. These persons were the ones who had substituted plaintiffs in their duties and Mrs. Scott identified them to plaintiffs as her group of "confidence". All of them were members of the Popular Democratic Party.

17. Defendant Scott never met with plaintiffs as requested to discuss the taking away of their duties as she insisted that she would only meet if her "confidence group" was present.

18. All plaintiffs testified that they had been relieved of their duties and responsibilities solely because of their political affiliation. Even though defendant María P. Scott was a party in the case, was present during all the process and also testified, she presented no other justification for her conduct.

19. On January 24, 1985 all plaintiffs wrote to defendant Awilda Aponte Roque explaining that Mrs. Scott had taken away their duties and asking Mrs. Aponte Roque to take a hand in the situation and resolve the matter urgently in light of its importance. Defendant Aponte Roque's only response was to refer the matter to the attention of defendant Scott, the very person of whom plaintiffs were complaining, by such action permitting the situation to continue.

Mrs. Aponte is the nominating and highest authority in the Department of Education and had powers to investigate and reverse the situation created by defendant Scott.

20. When she took away plaintiffs' duties, defendant María P. Scott had barely begun a series of studies of the needs of the Humacao Region. Mrs. Scott testified that said studies had not been completed up to the time when this trial was held, almost one year after she took office as Regional Director.

21. After having taken away plaintiffs' duties, defendant Scott has from time to time assigned each of them certain tasks in the Region, all of lesser category than their original duties, and not the proper duties of their career positions.

22. All defendants, previous to the change of command in the Department of Education, had functions in accordance with the positions they held. As a matter of fact, it is undisputed that all defendants were the Senior Staff of the Region and, as such, were supposed to supervise personnel in their respective areas of work. This supervision was taken away by defendants when they took charge of the Department of Education, in particular, the Humacao Region.

23. At the time the change of government took effect, plaintiff María M. Agosto's career position was Assistant Regional Director. The duties pertaining to said position which she was discharging at the time Mrs. Scott became Regional Director were the following (quoting Joint Exhibit 3, certified English translation):

"1. Cooperate with the region director in the distribution and sending of funds to be assigned to the different programs being developed in the school districts.

"2. Cooperate with the region director and the administrative aide in the preparation of an inventory of the needs in terms of materials and equipment for the use of the educational region personnel.

"3. Charged with the preparation of an inventory of the educational needs of all

the region personnel and of the school districts that make up the same.

"4. Charged with tabulating, analizing (sic) and establishing priorities in the study of the needs of the teaching personnel.

"5. Charged with participating in the preparation and supervision of the training plan of all programs being developed in the educational region.

"6. Charged with participating in the preparation and evaluation of the work plan of the educational region.

"7. Charged with preparing all the indispensable documents for preparing and evaluating the work plan.

"8. Serve as a teaching resource and advisor in all activities where her services are required.

"9. Cooperate with the regional director in the selection and recommendation of candidates to fill positions of general supervisors, school directors, teachers with special functions, and others.

"10. Participate and form part of interviewing committees for vacant positions in the educational region.

"11. Cooperate with the regional director in the preparation and sending of memoranda and other official documents.

"12. Cooperate with the regional director in the preparation and management of administrative rules for personnel functions at the regional level.

"13. Program, supervise and evaluate operation visits to the school districts.

"14. Carry out operation visits to the school districts.

"15. Give final approval to the weekly programming of work to be carried out by educational region personnel.

"16. Cooperate with the regional director in the planning, development and evaluation of the weekly meetings with the supervisory personnel and with others.

"17. Cooperate with the regional director in the preparation, development and evaluation of all teaching activities to be carried out with the school superintendents.

"18. Participate and cooperate with the regional director in the work of the educational region planning committee.

"19. Cooperate in the planning, development and evaluation of the work performed by the teaching personnel and the administrative staff of the educational region office.

"20. Prepare and process evaluation reports of the educational region employees.

"21. Cooperate with the regional director in receiving commissions, civic groups, parents, etc., interested in bringing up issues.

"22. Prepare, analize (sic) and discuss with the school superintendents all central level reports in relation to circular letters, memoranda, academic test results, visit reports, performance reports, etc.

"23. Cooperate with the regional director in the preparation and processing of work correctly and on time.

"24. Prepare and participate together with the regional director in activities that will ensure better relations between the school and the community.

"25. Cooperate with the regional director in the planning, development and evaluation of cultural and social activities to celebrate and commemorate holidays, etc.

"26. Carry out other tasks related to her position."

24. Within four (4) days after defendant María P. Scott became Humacao Regional Director, the defendants took away Agosto's duties and responsibilities outlined in Finding of Fact 23 and assigned her the task of being in charge of the Special Education Program and allowed her to continue signing checks. The responsibility of the Special Education Program is a lower category task than the ones she was discharging at the time of the political change.

Before the change by Mrs. Scott in January 1985, plaintiff Agosto used to supervise Luz M. Camacho Ortíz, General Supervisor of School Services), Virginia Díaz (General Supervisor of School Services), Vicente Vázquez Castro (General Supervisor of School Services), Miguel A. Vega Díaz

(General Supervisor Chapter I Program in the Region).

These changes in job duties have been extremely drastic. By such changes, plaintiff Agosto has been made to appear to be a mere assistant rather than the Assistant Director of the Region, and to all practical purposes, to be an employee who has been demoted.

25. As a consequence of the discriminatory changes in Agosto's tasks, as outlined in Finding of Fact 23, plaintiff Agosto's image in the community and before her fellow workers has been diminished, her emotional tranquility has been affected, her attitude towards attending her work has been adversely affected, her family's tranquility has been disturbed, and her relations with her husband and children have adversely changed.

26. At the time the change of government took effect, plaintiff Virginia Díaz' career position was General Supervisor for School Services. The duties pertaining to said position, which she was discharging at the time Mrs. Scott became Regional Director, were the following (quoting Joint Exhibit IV, certified English translation):

"1. Serve as a resource person for the Regional Directorate in the process of private school supervision, by performing the following tasks: You will

a. Serve as liaison between the Department of Education and the private schools in the Educational Region.

b. Plan and carry out supervision visits to private schools in order to:

1) Check the operation of these institutions regarding compliance with current rules and laws.

2) The Development (sic) of the teaching-learning process.

3) Investigate complaints to the Secretary of Education in those areas covered by current regulations.

4) Follow up on compliance with the obligation to write reports.

5) Turn in and route the corresponding report.

c. Offer guidance to citizens interested in running private education institutions, and to parents, students and school personnel who ask for it, regarding legislation and regulations applying to private schools.

ch. Receive, evaluate and follow up the documents submitted by the different schools regarding accreditation and license renewal.

d. Coordinate with the resources available in the Department of Education to provide them to private schools when asked for them.

e. Refer to the appropriate level any problematic situation in the schools under your jurisdiction.

f. Coordinate the organization and visits of the Ad Hoc Committee for accreditation and license renewal purposes.

1) Recommend candidates for the Committee for consideration by the Director of the Region.

2) Identify the areas to be assigned for evaluation to each committee member.

3) Coordinate the visit plan with representatives of the schools to be evaluated.

4) Direct the work of the Committee during the visit.

5) Receive the visit report from the members of the Committee and call a meeting to establish consensus.

6) Write and submit the final report of the evaluation to the Director of the Educational Region.

"2. Cooperate and assist the Director the Region in the coordination, supervision and evaluation of teaching personnel.

"3. Render assistance to the district level by means of the necessary guidance in the preparation of school organizations, use of time and human and physical resources.

"4. Participate together with the Regional Directorate and other teaching personnel in the preparation and evaluation of the work plans.

"5. Cooperate with the Regional Directorate in the coordination and implemen-

tation of the teaching practice program of the Project School without grades.

"6. Carry out related tasks."

27. Within four days of defendant Scott's assumption of position as Director, plaintiff Díaz' functions of her classification were taken away and she was given two functions instead: work with (1) the schools that do not have grades, and (2) the private schools. All her functions of supervising personnel and coordinating work were taken away and not given back. The two functions now assigned do not entail the task of supervising or coordinating personnel.

Before, the change, plaintiff Díaz had a telephone for her own use; now she must ask permission to use the telephone. She also must ask permission to use the photocopier and the typewriter. These all are indicia or evidence of rank which has been purposely taken away to show that plaintiff Díaz is no longer in command, and to show that her stature has been diminished because her political party lost the elections.

28. Plaintiff Díaz' political activity in the New Progressive Party since 1972 includes attendance at party meetings working in elections and cooperation with the party.

29. The reduction of Diaz' tasks to only two has caused Mrs. Díaz to feel that she is no good (this is the first time in her professional life this has happened to her), and to feel that today should be tomorrow so she could retire now. Her emotional state has been greatly affected by the change.

30. At the time the change of government took effect, plaintiff Luz M. Camacho's career position was General Supervisor of School Services. The duties pertaining to said position which she was discharging at the time Mrs. Scott became Regional Director were the following (quoting Joint Exhibit I, certified English translation):

"1. Cooperate and participate jointly with the Regional Directorate and the School Superintendents in the following aspects:

a. recopilation, organization and interpretation of data in order to identify educational needs and establish priorities.

b. recopilation and evaluation of alternatives to take care of the situations identified

c. planning and scheduling of work

ch. budgeting of time and resources

d. preparation and evaluation of the work plan

"2. Follow up on the work plan of the Educational Region and the school district. You will be able to count on the aid and cooperation of the general supervisors for the task.

"3. Advise and assist the Regional Directorate and the school superintendents regarding work techniques with group and organization and personnel management techniques.

"4. Follow up on the work plans in terms of the process and the results:

a. check or verify the educational situation to find out if its standing is based on facts

b. confirm that the activities carried out and the results obtained from the same are in accordance with the objectives stated

c. follow up on any situations identified to determine the progress made

ch. evaluate any aid offered and investigate any other aids needed.

d. determine if the implementation of plans and projects responds to the planning and scheduling carried out.

e. follow up on the use of the results of the investigation and of the evaluation in order to enhance education.

"5. Serve as a resource to give guidance and to evaluate management personnel and all teaching personnel as needed.

"6. Follow up on the educational technology work plan of the Region, to ensure that it meets the educational needs of the district.

"7. Provide for curriculum revision of those programs in need of this revision.

"8. Participate in and evaluate the implementation of any new curricula or revision of the same.

"9. Follow up on the practice of new educational techniques and procedures such as:

    a. method

    b. content

    c. curriculum

    ch. supervision strategies

"10. Study the needs and participate in the guidance and training carried out at the regional and district level for the purpose of enhancing the quality of teaching.

"11. Keep the Regional Director informed about everything related to teaching in terms of:

    a. plans

    b. findings

    c. problems found and possible solutions

"12. Cooperate and aid at the district level in:

    a. developing the work plan

    b. using the results of the evaluation

    c. in-service guidance

"13. Cooperate with the Regional Directorate in decision-making and in the effective management of the special education vocational program.

"14. Coordinate, supervise and evaluate the teaching performance to be carried out by the staff under you:

    a. Work schedules

    b. Special projects

    c. Special projects (sic)

    ch. Teaching Administration

"15. Cooperate with the Regional Directorate in the implementation, follow-up and evaluation of the following projects:

    a. Chapter I

    b. Immersion Camps

    c. Advanced Level

    ch. Multigrade Schools

    d. Follow through

    e. Institute of Educational Sciences

    1) Training for teachers on Saturdays

    2) Summer training

    f. Basic Skills

    g. Supervision

    h. Counseling

    i. Guidance

    j. Evaluation

"22 (sic) Advise and cooperate in the organization, development, supervision and evaluation of student organizations such as:

    a. Boy Scouts and Girl Scouts

    b. Educational leaders

    c. Future Business Leaders

    ch. VICA

    d. FLEC

    e. School Patrol

    f. Juvenile Red Cross

    g. Other subject course organizations.

"23 (sic) Carry out other duties related to the position."

31. After assuming directorship, defendant Scott changed plaintiff Camacho's tasks by assigning her tasks outlined in Finding of Fact 30 to another personnel and by telling her she was going to continue handling the talented students projects and those of advanced levels.

Plaintiff Camacho does not supervise anybody anymore. Previously, she coordinated the supervisors assigned to the science area. She has been assigned in turn to supervise an Elementary Science program although Scott knows that plaintiff Camacho does not have the academic preparation for that program. Defendant told plaintiff that said program was all there was for her in the region. These are all indicia or evidence of rank which has been purposely taken away to show that she is no longer in command and to show that her stature has been diminished because her political party lost the elections.

32. In addition, defendant Scott told plaintiff Camacho that the reason for the change is that there had been a political change in Puerto Rico, that employees like

Lydia Cruz had been marginated by other political administration, which the Court concludes is the New Progressive Party in power for eight years (1976–84) as an excuse for what they were doing to this particular plaintiff.

33. Plaintiff Camacho's political activities in the New Progressive party since 1968 includes attendance at activities of the party, work during the electoral process as a party official, contribution of money to the party, representation of the New Progressive Party at the electoral college.

34. As a result of the change in activities outlined in Finding of Fact 30, plaintiff Camacho has been harassed and placed under pressure. She is undergoing treatment for tension which has affected her family life and consequently she feels very bad.

35. At the time the change in government took effect, plaintiff Miguel A. Vega was General Supervisor for School Services. As General Supervisor for School Services, Mr. Vega was assigned to be the Regional Coordinator of Chapter I, with the duties of coordinating and supervising said program at the regional level, including selection of personnel for the program, supervision of personnel in the program, evaluation of the program and coordination with the central office of the Department of Education.

36. Plaintiff Vega testified that his job classification had been changed and he was doing other tasks because of the change of government. However, plaintiff Vega failed to produce evidence sufficient to establish in detail the tasks which were assigned to him before and after the change of government and the difference between one and the other. He thus failed to prove that there had been substantial changes in his tasks by Scott or that the same were changed to tasks of lesser category.

37. At the time the change of government took effect, plaintiff Vicente Vázquez Castro's career position was General Supervisor for School Services. The duties pertaining to said position which he was discharging at the time Mrs. Scott became Regional Director were the following (quoting Joint Exhibit V, certified English translation):

"1. Cooperate and participate jointly with the Regional Directorate and the school superintendents, in the following aspects of the vocational and student services areas:

a. recopilation (sic), organization and interpretation of data in order to identify educational needs and establish priorities.

b. recopilation (sic) and evaluation of alternatives to take care of the situations identified.

ch. planning and scheduling of work

d. budgeting of time and resources

e. preparation and evaluation of the work plan

"2. Follow up the work plan of the Educational Region and of the school districts. You will be able to count on the aid and cooperation of the general supervisors for that task.

"3. Advise and assist the Regional Directorate and the school superintendents regarding work techniques with groups and organization and personnel management techniques.

"4. Follow up the work plans in terms of the process and the results:

a. check or verify the educational situation to find out if its standing is based on facts.

b. confirm that the activities carried out and the results obtained from the same are in accordance with the objectives stated.

c. follow up any situations identified to determine the progress made

ch. evaluate any aid offered and investigate any other aids needed

d. determine if the implementation of plans and projects responds to the planning and scheduling carried out.

e. follow up the use of the results of the investigation and of the evaluation in order to enhance education.

"5. Serve as a resource to give guidance and to evaluate management personnel and all teaching personnel as needed.

"6. Provide for curriculum revision of those programs in need of this revision.

"7. Participate and evaluate in the implementation of any new curriculum or revision of the same.

"8. Follow up the practice of new educational techniques and procedures such as:
   a. method
   b. content
   c. curriculum
   ch. supervision strategies

"9. Study the needs and participate in the guidance and training carried out at the regional and district level for the purpose of enhancing the quality of teaching.

"10. Keep the Regional Director informed about everything related to teaching in terms of:
   a. plans
   b. findings
   c. problems found and possible solutions

"11. Cooperate and aid the district level in:
   a. developing the work plan
   b. using the results of the evaluation
   c. in-service guidance

"12. Cooperate with the Regional Directorate in decision-making and in the effective management of the special education vocational program.

"13. Coordinate, supervise and evaluate the teaching performance to be carried out by the staff under you:
   a. Work schedules
   b. Special projects
   c. Related programs
   ch. Teaching practices

"14. Cooperate with the Regional Directorate in the implementation, follow-up and evaluation of the projects related to the programs under your charge.

"15. Follow up the following programs in terms of operations and meeting established rules:
   a. school meals
   b. transportation
   c. scholarships

"16. Keep statistical evidence of services rendered to the students of each school district.

"17. Cooperate with the school districts and the Regional Directorate in everything related to any type of bid.

"18. Form part of the scholarship committee at the regional level and cooperate in any decisions taken in that area.

"19. Cooperate with the school districts in placing students from other educational systems.

"20. Work in coordination with the Educational Extension area and the supervisors that represent it to follow up and update guidance and services regarding placing exams, laws, or subjects to be offered to student.

"21. Follow up and cooperate with school superintendents on the following aspects of school transportation:
   a. determining needs
   b. assigning funds
   c. bids
   ch. hiring
   d. payments"

38. All previous functions of Mr. Vázquez were taken away by Mrs. Scott with the exception of the School Transportation program and, as to that function, he only discharges it partially. His present duties are minimal in comparison with his previous job. Tasks were given to Luis Meléndez, whom plaintiff Vázquez used to supervise because Meléndez is his junior and is an employee of lesser category. All 1985 new jobs assigned to Vázquez were of a lesser category than the ones in his job description.

39. Plaintiff Vázquez's political affiliation has been with the New Progressive Party since 1967–68. Before that time, plaintiff Vázquez was a member of the Statehood Republican Party (same ideal of Statehood as the New Progressive Party). In 1972–76, plaintiff worked at the elector-

al college; in 1980, he served as instructor of the offices of the electoral district; in 1984, he served as Unit 23 coordinator and gave seminars for statehooders.

40. As a result of the change of activities outlined in Finding of Fact 37, plaintiff Vázquez was humiliated before his colleagues, he has had to go on sick leave, and his family life has been affected. People would ask him if he was discharging functions from the operation side or of what particular side. Telephone was taken away from him. Scott insulted him, calling him lazy. He was accompanied to School District visitation by Scott's "trust" (confidence) employees, Mr. Principe and Mr. Joel Díaz. He found that his visits to the School Districts were being cancelled without any reason. He was removed from the sub-director's office. All these happenings are the efforts of defendant Scott to pressure and humiliate the plaintiffs in general and Vicente Vázquez in particular.

41. The "Rules and Regulations for the Certification of Teachers in the Public and the Accredited Private Schools of Puerto Rico" establish the requirements to fill the different positions in the Department of Public Instruction. The requirements to fill a position as a General Supervisor for School Services are (1) a Master's Degree with a major in activities or services related to the school programs; (2) a minimum of 15 credits in school administration and supervision; (3) at least three years of experience in school supervision. All of the plaintiffs fulfilled each of these requirements. In order to supervise a specific academic subject, however, either at the general supervisory level or other levels, other requirements must be met, including a Master's Degree in the subject.

42. Plaintiff Luz M. Camacho does not have a Master's degree in science and is therefore not qualified to supervise the science program. Defendant Scott is aware of this but insists that plaintiff Camacho supervise said program.

43. Since January 1985 to the present, defendants have relieved plaintiffs Agosto, Camacho, Vázquez and Virginia Díaz of their duties and responsibilities and have refused to assign to them duties compatible with their career positions notwithstanding their protests to both defendants. In addition, for the same period, defendants have assigned to these plaintiffs tasks which are incompatible with and inferior to their career positions and continue to do so with no indication of any intention to correct the situation. Even though plaintiffs' titles and salaries have been maintained, defendants' actions, for all practical purposes, constitute demotions of plaintiffs Agosto, Camacho, Virginia Díaz and Vázquez. Defendants have taken all these actions for the sole reason that plaintiffs are members of the New Progressive Party and do not share defendants' political affiliations with the Popular Democratic Party. Furthermore, in taking said actions and refusing to correct them or even discuss them with plaintiffs notwithstanding the plaintiff's requests to both defendants, the defendants have shown malicious intent in their acts against these plaintiffs.

44. All five plaintiffs, as career employees in the Department of Education, enjoyed tenure and had an expectancy of continued employment in their positions.

45. Because of defendants' actions against plaintiffs Agosto, Camacho, Vazquez and Virginia Díaz detailed in Finding of Fact No. 44, these four plaintiffs have suffered and continue to suffer considerable mental and emotional distress. They have been scorned and ridiculed by their co-workers and subordinates. They feel that they are constantly being humiliated and, after more than twenty years each in public service during which they have risen progressively to the highest levels in the Department of Education, they feel helpless, frustrated, anguished, intimidated and apprehensive about their futures as public employees.

## B. CONCLUSIONS OF LAW

■ To prevail in an action brought under Section 1983, two essential elements must be proven: (1) that the conduct complained of was committed by a person or

persons acting under color of state law; and (2) that this conduct deprived a person or persons of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). At the outset of our inquiry, we find that plaintiff Miguel A. Vega has failed to meet his burden of establishing a prima facie case under this standard. As set forth in Finding of Fact No. 36, we cannot hold on the evidence presented that substantial changes in his position were perpetrated by Mrs. Scott or that such changes caused any injury or deprivation of his rights. We, therefore, DISMISS his claim, and in the following discussion refer only to the remaining four plaintiffs: María Agosto, Luz Camacho, Virginia Díaz, and Vicente Vázquez.

▮ The first prong of the *Parratt* test requires a showing of a causal connection between defendants' acts under color of law and the alleged injuries. In the case before us, there is ample evidence on the record supporting such a showing and defendants have presented no evidence to controvert this showing. We therefore find, as a matter of law, that defendants' acts under color of law as detailed in the Findings of Fact, caused the injuries stated in the Findings of Fact.

The second prong of the § 1983 analysis involves the determination whether the defendants' conduct deprived the plaintiffs of their rights under the Constitution or laws of the United States. Plaintiffs have alleged violations of both their First Amendment rights to freedom of association and their Fourteenth Amendment right to procedural due process.

1. *First Amendment Right to Freedom of Association*

▮ As evidenced by the Findings of Fact, the remaining four plaintiffs have established their prima facie case of political discrimination. The evidence reveals that defendants Aponte and Scott demoted the plaintiffs, members of the NPP, relieving them of their duties and responsibilities and reassigning them to tasks which are incompatible with and inferior to their career positions, while assigning their previous duties to personnel who are members of the PDP and in lower positions than the plaintiffs. In addition, discriminatory motive is well supported by the record. Defendant Scott admitted that the changes in plaintiffs' tasks were due to the PDP victory in the election, and defendant Aponte, who referred the plaintiffs back to Mrs. Scott upon their appeal to her, participated in and approved defendant Scott's conduct.

Secondly, defendants have presented no viable alternative reason for their conduct which would bring their actions under the analysis of *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). We therefore find that the sole basis for defendants' conduct was plaintiffs' political association with the NPP and consequent lack of participation in defendants' political affiliation with the PDP.

Where, as here, political affiliation is the sole basis for the defendants' discriminatory conduct, we must scrutinize strictly whether there is any overriding government interest of vital importance to justify this conduct. *Elrod v. Burns*, 427 U.S. 347, 362, 368, 96 S.Ct. 2673, 2684, 2687, 49 L.Ed.2d 547 (1976). The ultimate inquiry here is whether party affiliation is an appropriate requirement for the effective performance of the public office involved. *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980). The answer here is no. The primary responsibilities of the plaintiffs prior to their demotion involved the planning, development and evaluation of the educational programs in the Humacao region. Thus, whatever policymaking occurs in plaintiffs' jobs must relate to the educational needs of the region and not to any partisan political interests. Nor can we envision any access to confidential information of a partisan political nature mandated by plaintiffs' tasks. Even if there were such access, there exist far less restrictive means by which defendants could safeguard their

own political interests short of wholesale demotion of the Humacao supervisory staff.

Defendants contend that they have total and absolute discretion in assigning duties and functions to the personnel in the Region. However, this Court can find no credible justification in taking away important tasks which entail, among other duties, a high degree of supervision and control of the department's functions, and re-assigning those tasks to other personnel. There appears no reason in sound administrative practice or pedagogic criteria that would justify such a drastic change of command in the educational region of Humacao. Experience in human affairs and a logical and practical assessment lend no other conclusion but that the withdrawal of tasks from the four plaintiffs as a matter of fact and the reassignment of those tasks to others who share the same political persuasion of the defendants was the sole result of a political animus.

The purpose behind defendants' conduct in this case was to demonstrate to the employees and those associated with the school system in the Humacao District that the power to hire, fire, manage, supervise and otherwise control employment resided in a particular political party rather than in a particular new administration. In order to accomplish such purpose, defendants had to discriminate against the remaining four plaintiffs because of their political belief and in so doing, defendants knowingly and intentionally harrassed, and abused these employees in violation of their constitutional rights. This has been done by taking away from them the imprint of authority which carries with it the respect of subordinates, and by telling the employees and the community that those not affiliated with the Popular Party are out of power and do not deserve and should not be given the respect their positions entail. The message sent to the community in general was that they must cater to the politicians of the victorious party. All this was done with political gain as the only purpose in mind. As a result of being able to control the administration through such conducts, defendants intend to put themselves on a position to make new converts to their party, thus affecting the result of the 1988 election and perpetuating themselves in power.

The government established by the founders of our nation is a government run for the benefit of all the people, not for the purpose of perpetuating the political party in power. Executive officials who insist on violating the civil rights of government employees to replace them with their "cronies" only prove that they have put their desire to stay in power and in office ahead of all other considerations in a manner reminiscent of a "president for life" syndrome. These motives and actions contravene the constitutional mandate which aims for the continuity of democracy and, above all, the preservation of freedom.

The negative effects of patronage practice on the free and efficient functioning of our government has been vigorously noted by the highest courts of the United States and Puerto Rico. *E.g., Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547; *Juan Hermán Colón v. Corporación de Renovación Urbana y Vivienda,* 84 JTS 52 (P.R.1984). The threat latent in conditioning public employment on partisan support is well expressed in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547. First, the practice exacts a ruthless toll on the individual employee's ability to act according to his beliefs and to associate with others of like political persuasion, thus diminishing support for his political party. *Id.* at 355–6, 96 S.Ct. at 2681. Secondly, the free functioning of the electoral process suffers because competing political interests are not supported. The Supreme Court aptly stated the problem:

Conditioning public employment on partisan support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs. As government employment, state or federal, becomes more pervasive, the greater the dependence on it becomes, and therefore the greater becomes the power to

starve political opposition by commanding partisan support, financial and otherwise. Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant.

*Id.* at 356, 96 S.Ct. at 2681.

The political encounter before us in this case illustrates these principles. It surpasses local political boundaries and political persuasion toward statehood or commonwealth status for Puerto Rico.[2] The undeniable fact is that the officers of the Republican National Party in Puerto Rico are leaders in the NPP,[3] and the leadership of the Democratic National Party is composed of two factions: one containing leaders of the NPP, the other containing leaders of the PDP.[4] Although the citizens of the United States residing in Puerto Rico

**2.** The national implications of local party politics have been the subject of public expression of opinion as well. *See e.g., The San Juan Star,* March 5, 1986, at 13, col. 3 ("Award to Kennedy"); *The San Juan Star,* Feb. 23, 1986, at 6, col. 1 (Editorial, Andrew Viglucci, "When a feller needs a friend").

**3.** The founder of the NPP, Luis A. Ferré, is the National Chairman of the Republican Party of Puerto Rico, and as such, sits on the Republican National Committee.

**4.** Minutes of the Democratic National Committee, Resolution of January 30, 1985, at 13, 14 [certified copy in record]. The Resolution reflects the dispute for control of the Democratic party of Puerto Rico which occurred after the change of local government in 1984. From 1976 until 1984, Carlos Romero Barceló was Governor of Puerto Rico. During that time, Mr. Romero, the President of the NPP, aligned himself with the Carter-Mondale faction of the Democratic Party. *See, e.g.,* Resolution of January 30, 1985, *infra* (references to last eight years of disputed control and to impact of Governor's office on the party). Rafael Hernández Colón, the Governor of Puerto Rico since 1984 and the President of the PDP, is a Democrat affiliated with the Senator Edward Kennedy branch of the party. *E.g., The San Juan Star,* Feb. 22, 1986, at 3, col. 3. As a matter of fact, both prior to and after the 1984 elections, Senator Kennedy has campaigned in Puerto Rico on behalf of the PDP and its President Rafael Hernández Colón. *Id.*

The Resolution reads as follows:
WHEREAS, the control of the Democratic Party of Puerto Rico has been in serious dispute for over eight years; and
WHEREAS, during this time a series of credentials disputes have developed over the organization of the Democratic Party and the seating of Puerto Rico's representatives to the Democratic National Committee; and
WHEREAS, the organization of the Democratic Party of Puerto Rico has seemed to be impacted by positions on the future status of the Island and the control of the Governor's office; and

WHEREAS, it is clear that there are elements within both principal political parties on the Island, the Popular Democratic Party and the New Progressive Party, as well as others, who wish to affiliate with the Democratic Party on the national level and participate in Democratic Party affairs irrespective of position on status, ideology or Puerto Rican party identification; and
WHEREAS, the intensity of the internal Puerto Rican political dispute has made it very difficult for all of these who wish to participate in Democratic Party affairs to work with each other; and
WHEREAS, it is the intent of the Democratic National Committee, pursuant to Article 2, Section 12(a) of the By-Laws to bring together those elements within both principal Puerto Rican political parties;
NOW, THEREFORE, BE IT RESOLVED, by the Executive Committee of the Democratic National Committee that the Puerto Rican issue be resolved as follows:
1. The Executive Committee believes that only a compromise can prevent this situation from becoming a chronic and irreparable problem for the Democratic Party both in the United States and Puerto Rico.
2. The Executive Committee directs a Democratic caucus of the ruling bodies of both the Popular Democratic Party and the New Progressive Party to designate two men and two women each, to represent Democrats within their parties who wish to participate in national party affairs.
Each caucus shall designate a chair and vice chair of said members to be known as co-chairs and co-vice chairs of the Puerto Rican Democratic Party. All party matters shall be decided by a majority vote of the National Committee members of the Democratic Party of Puerto Rico who chose to participate under the terms of this compromise plan. The eight members so designated by their respective caucuses shall serve through the first meeting of the Democratic National Committee subsequent to the 1988 Democratic National Convention.
3. That the respective four men and four women so designated be seated as members

do not vote directly for the President, they vote in the primaries of the Republican and Democratic parties. The Puerto Rico Delegation to the Democratic Party Convention has 53 votes out of the total of 3,933.[5] The Democratic nominee who dominates local politics in the years to come will have a big edge over any other in deciding how those 53 delegates at the Democratic convention are to vote, particularly with regard to the nomination for president. Thus, the stake at issue here is raw political power on a national scale. The attempts of the defendants before us to politicize the bureaucratic structure of the government of Puerto Rico, if successful, would help greatly to influence the votes in local and national primaries, nominations and elections.

The Puerto Rico Supreme Court has emphasized the detrimental results of this wholesale dismissal system and the crucial role of the Courts in arresting its perpetration:

> It is indispensable that the Courts do away with the tendency and the vicious circle that is established in the country after every general elections, of substituting government personnel for reasons foreign to a sound public administration: patronage, spoils and partisan political retaliation. *Oliveri Morales, supra.* The drama repeats itself every time there is a change of administration representing a different political affiliation. The detrimental consequences are fatal and they are cause for alarm. The erosion of funds is considerable. The judiciary is aware of the financial crisis and the negative budgetary impact of satisfying this type of judgment. It constitutes a substantial deviation of public funds to the detriment of essential services to the citizens, regardless of their political affiliation. The courts must make an all-out effort to design dissuasive remedies [3] ... The situation is critical and calls for urgent judicial remedial creativity. [translation ours].

*Colón v. CRUV*, 84 JTS at 3628–29. To sidetrack now the effective meaning and consequence of the Puerto Rico Supreme Court case entered against the NPP which rightly precluded said party from an unfair advantage would be to give the PDP an advantage which the NPP did not have. Just as the Court in *Colón* stated and applied the law correctly to the set of facts before it, so we certainly shall follow it in order to protect the civil rights and all U.S. citizens in Puerto Rico independently of the political affiliation of the Government.

---

of the Democratic National Committee, with one half vote each as of the meeting of the DNC scheduled for January 30—February 1, 1985 **

4. That the Executive Committee makes it clear to all the seated delegates from Puerto Rico that the DNC hopes and expects that, pursuant to the model of cooperation and goodwill which guided the reunification of the Mississippi Freedom Democratic Party and the Mississippi Regular Democratic Party in 1975, that all factions of Puerto Rico committed to the principles of the National Democratic Party develop a working relationship in the Puerto Rican Democratic Party for the future.

5. The Puerto Rican Democratic National Committee members shall submit to the DNC, for its approval, at its second meeting of 1986, a plan for the permanent reorganization of the party to be conducted during the first quarter of 1987. Such plan shall provide for a reorganization open to all who wish to support the Democratic Party of the United States and who wish to be known as Democrats.

This process shall be conducted pursuant to the standards of non-discrimination and affirmative action incorporated into the Charter of the Democratic Party.

6. The Secretary of the Democratic National Committee is hereby authorized to accept certification of election of members of the Democratic National Committee from the Commonwealth of Puerto Rico by the respective Presidents of the Popular Democratic Party of Puerto Rico and the New Progressive Party of Puerto Rico.

** The Executive Committee adopted an amendment that specified voting privileges would be assumed by the members from the Popular Democratic Party at the DNC meeting, in the Spring of 1985.

5. Bush, Official Proceedings of the 1984 Democratic National Convention San Francisco, CA., July 16—July 19, Democratic National Committee (1984). The Puerto Rican delegation compared to the rest of the delegations ranks approximately 26 in priority from highest to lowest.

If the Courts—Federal or local—were to play politics along with the executive branch in deciding these type of cases implicating the rights of individuals and our democratic system, we would be shown in poor light indeed. *Cf. Lasa v. Colberg,* 622 F.Supp. 557 (D.P.R.1985); *Martínez Acosta v. Hernández Agosto,* 590 F.Supp. 144 (D.P.R.1984) (decisions upholding the legislative privilege of Popular-dominated Puerto Rican Legislature against claims of civil rights violations of New Progressive Party plaintiffs). If we as a Federal Court were to favor the political party presently in power, or to decide based on political persuasions, we would be betraying the one and only client to which we have sworn loyalty: the Constitution and laws of the United States.

We now confirm that the conduct before us in this case, resulting from the brutality of political extremes which infringes and disintegrates the civil rights of people, will be considered as an assault on our culture based on Constitutional principles and will not be tolerated. Regardless of the means used to restrict individual freedom and political competition, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by work or act their faith therein." *Id.* 427 U.S. at 356, 96 S.Ct. at 2681, (*quoting Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943)).

The Community of Puerto Rico within the United States is the 20th Century frontier of the United States. It has adopted and consecrated as an essential part of its life the principles of freedom and protection of the natural rights of humankind incorporated into the Constitution of the United States. The protection of these rights

"reflect our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 [84 S.Ct. 710, 721, 11 L.Ed.2d 686] (1964), a principle itself reflective of the fundamental

understanding that "[c]ompetition in ideas and governmental policies is at the core of our electoral process ..." *Williams v. Rhodes,* 393 U.S., at 32 [89 S.Ct. 5, at 11, 21 L.Ed.2d]. Patronage, therefore, to the extent it compels or restrains belief and association, is inimical to the process which undergirds our system of government and is "at war with the deeper traditions of democracy embodied in the First Amendment." *Illinois State Employees Union v. Lewis,* 473 F.2d, at 576.

*Elrod v. Burns,* 427 U.S. at 357, 96 S.Ct. at 2682. With this constitutional background ever present we must examine the conduct of defendants before us.

The set of facts in this case makes us conclude that we are presented with the typical scenario of an employer wishing to discharge an employee without actually writing the separation letter: the employer transfers the employee to a small office with a desk facing the wall and insignificant or no tasks to perform. This scenario must be viewed with the true identity of the actors in mind. We have before us not private employers but the government. We see, not employees, but public servants who are U.S. citizens with all the rights of American citizenship, including entitlement to the protection of their civil rights against government infringement. The conduct of the government actors is not motivated by any legal or practical purpose but rather by the crass application of political extremism. When political victory becomes the end in place of the common good, when the power to distribute the wealth by taxation is esteemed in place of good government of the people, and when the public administration of government is structured to perpetuate a particular party or person in power, rather than to create, administer and enforce legislation for the common good, then we have a government that is willing to violate, and will violate, the civil rights of its citizens. The spoils system so devoid of the democratic experience of this community grounded in the United States Constitution is an acceptance of rootlessness which this Court, along with all others, should not embrace.

### 2. *Fourteenth Amendment Right to Procedural Due Process*

■ As stated in the Findings of Fact, plaintiffs' previous duties were taken away from them without notice or opportunity to be heard beforehand. After being relieved of their duties, plaintiffs were told by defendant Scott that, the changes were in keeping with the political changes of government. Plaintiffs' request for a meeting with defendant Scott after relief from their duties was never granted. Plaintiffs' further request for action from defendant Aponte Roque was never taken seriously as Aponte merely referred the matter back to defendant Scott. The issues before us in plaintiffs' due process claim are whether the due process clause applies and, if so, what process should have been given to the plaintiffs.

In determining whether constitutional due process safeguards apply to the case before us, we must inquire whether plaintiffs' liberty or property interests within the guarantee of the Fourteenth Amendment were implicated under these circumstances. An individual's liberty interest has been held to be implicated "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him [and] notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (quoted in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). The facts of this case evidence that the good name, reputation, and honor of the four remaining plaintiffs were jeopardized by the defendants' conduct. The plaintiffs have suffered the scorn and ridicule of their co-workers and subordinates and have felt humiliated by their present work conditions and tasks. Indeed, the stigma resulting from their demotions-in-fact would hinder the plaintiffs in seeking other employment opportunities.

Secondly, an individual's property interest has been held to be created and defined by existing rules or understandings that stem from an independent source such as state law. *Roth*, 408 U.S. 577, 92 S.Ct. 2709. The plaintiffs before us were "career employees", a classification of public employee distinguished from "confidence employees" under Puerto Rico law. 3 L.P.R.A. § 1349. Unlike confidence employees, career employees are not hired and fired at will, but remain appointed to their duties until removed for good cause. 3 L.P.R.A. § 1336. Severance from service which is short of removal can be effected only when there exists lack of work or funds, or the employee is determined incapacitated. 3 L.P.R.A. § 1336(6). Thus, we conclude that the plaintiffs before us had a property right in their continued employment arising from Puerto Rico law. *See Cleveland Board of Education v. Loudermill*, —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Furthermore, this property right encompasses the interest in continued *active* employment in their rightly-assigned duties. *See Mims v. Board of Education of City of Chicago*, 523 F.2d 711, 715 (7th Cir.1975) (laid-off employees have property interest in continued active employment, not just in status as civil servants).

Once a liberty or property interest is triggered, the minimal amount of due process owed under the Due Process Clause is pre-deprivation notice and an opportunity for a hearing, however informal that opportunity may be. *Loudermill*, 105 S.Ct. at 1487–88. Plaintiffs in our case had no notice prior to defendant Scott's reassignments, and certainly no opportunity to respond before or after the change in their duties. However, the proper remedy in this case is not an injunction awarding further process. *Cf. Perry v. Sindermann*, 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). Rather, it is injunctive relief granting reinstatement under our First Amendment holding and an award of damages as set out below.

### 3. *Relief*

#### a) *Injunctive Relief*

■ In an action brought under Section 1983, equitable relief in the form of a permanent injunction is proper. *E.g., Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). In this action, the ap-

propriate injunctive remedy for a demotion based on a First Amendment violation is reinstatement of the remaining four plaintiffs to the duties of their career positions. We find the plaintiffs are entitled to this relief.

b) *Damages*

■ Liability under Section 1983 may be rooted in negligence alone depending on the underlying constitutional right at issue. *Daniels v. Williams,* —— U.S. ——, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), *overruling in part Parratt v. Taylor,* 451 U.S. 527 (1981). The *Daniels* Court held that as to the 14th Amendment claims alleging deprivation without due process, mere lack of due care is insufficient to state a claim. *Daniels,* 106 S.Ct. at 665. However, the Court left open the possibility of Section 1983 liability based on other constitutional provisions that might be violated by merely negligent conduct. *Id.* at 666. Nevertheless, we need not reach this issue in the case before us. Here, we hold that both defendant Scott and defendant Aponte Roque intentionally discriminated against the remaining four plaintiffs. Because defendant Aponte Roque refused to use her powers to correct the situation, even when asked, she is liable along with defendant Scott for the discriminatory actions outlined in the Findings of Fact.

Neither defendant has raised the defense of qualified immunity during this proceeding, and there is, therefore, no such question to be considered. It follows as a matter of course that the plaintiffs who have proven actual damages under Section 1983 are entitled to recover compensatory damages from the defendants who deprived them of their constitutionally protected rights. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Fernández v. Chardón,* 681 F.2d 42, 60. If proven, compensatory damages are available under Section 1983 for emotional and mental distress. *Carey v. Piphus,* 435 U.S. 247, 263–64, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978). The remaining four plaintiffs have proven emotional and mental distress resulting from the deprivation of their constitutional rights as stated in the Findings of Fact and they are entitled to recover damages from the defendants.

Punitive damages are available under Section 1983 when the defendants' conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Both defendants before us have been shown to meet this standard. Defendant Scott took office and, within four days, had relieved the plaintiffs of their duties and indicia of responsibility and esteem. She maliciously refused to consider or take corrective action. Defendant Aponte showed callous indifference by likewise refusing to correct the situation, and her referral of the plaintiffs to defendant Scott rises to the level of evil intent. This Court finds that the remaining four plaintiffs are entitled to punitive damages.

Finally, plaintiffs are entitled to attorneys' fees pursuant to the express provision of 42 U.S.C. § 1988.

Judgment will be entered accordingly. IT IS SO ORDERED.

### JUDGMENT

Based on our Opinion and Order of this same date, this Court hereby enters JUDGMENT in the form of a permanent injunction and award of damages for the plaintiffs, María M. Agosto, Luz M. Camacho, Virginia Díaz and Vicente Vázquez Castro, as follows:

1. The Court hereby ORDERS defendants Awilda Aponte Roque, María P. Scott, their officers, agents, employees and attorneys to immediately reinstate these four plaintiffs to the full duties, responsibilities and privileges which they had up to January 14, 1985, as described in the Findings of Fact, and which correspond to their career positions in the Department of Education of the Commonwealth of Puerto Rico. Defendants are further ORDERED to immediately cease and desist from their politically motivated acts of discrimination against these plaintiffs.

2. Defendants Awilda Aponte Roque and María P. Scott are hereby ORDERED

to pay each plaintiff the amount of $60,-000.00 in compensation for the damages they suffered as a consequence of defendants' actions.

3. Defendants Awilda Aponte Roque and María P. Scott are also hereby ORDERED to pay each plaintiff the amount of $60,000.00 in punitive damages.

4. Plaintiffs' costs and attorney's fees shall be paid by defendants Awilda Aponte Roque and María P. Scott.

The claim of Miguel A. Vega is hereby DISMISSED.

SO ORDERED AND ADJUDGED.