Victor LASA, Plaintiff,

v.

Severo COLBERG and Miguel Hernandez Agosto, Defendants.

Civ. No. 82–0149 (JP).

United States District Court, D. Puerto Rico.

Oct. 1, 1985.

---

558

Antonio Córdova, and Rafael Rosario Hernández, San Juan, P.R., for plaintiff.

Marcos A. Ramírez Lavandero, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

PIERAS, District Judge.

This action for alleged violation of civil rights, pursuant to 42 U.S.C. 1983 and 42 U.S.C. 1985, is before us on defendants' Motion to Dismiss, the Magistrate's Report and Recommendation and Defendants' Objections to said Report.

The facts alleged in the complaint are as follows:

Plaintiff Victor Lasa was appointed Superintendent of the Capitol Building on August 1, 1978 by the New Progressive Party legislators, pursuant to Law No. 4 of July 21, 1977, 2 L.P.R.A. Secs. 651–661. On January 4, 1982, defendants Severo Colberg and Miguel Hernández Agosto fired Lasa because of his ideological or political affiliation. Lasa claims that defendants Colberg and Hernández, using their respective positions as Speaker of the House and President of the Senate and acting under color of authority and law, have denied and infringed several Constitutional rights guaranteed to plaintiff, namely, his rights to equal protection of the law, due process of law, and political belief and association. Plaintiff requests this Court for injunctive relief and/or damages.

Defendants move for dismissal, alleging: (a) lack of jurisdiction because the complaint fails to present a substantial federal question; (b) failure of the complaint to state a claim upon which relief can be granted; and (c) immunity on the basis of the common law immunity recognized for state legislators.

A. *Jurisdiction:*

Defendant has alleged lack of jurisdiction for failure to present a "substantial" federal question. This Court takes defendant's allegations as a defense made under F.R.C.P. 12(b)(1), that is, lack of jurisdiction over the subject matter. In this case, the plaintiff has adequately alleged a cause of action for violation of constitutional rights. Regardless of the actual validity of said allegations, we find that federal question jurisdiction under 28 U.S.C. 1331 is sufficiently established for purposes of this lawsuit. *See Wheeldin v. Wheeler*, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963).

B. *Failure to State a Claim Upon Which Relief Can Be Granted:*

Defendants also assert a 12(b)(6) defense, alleging failure of the complaint to state a claim upon which relief can be granted.

Insofar as plaintiff's claim under 42 U.S.C. 1985 is concerned, and reading the complaint in plaintiff's favor as a claim brought under subsection (3) of said statute, this Court finds that plaintiff has failed to properly and specifically plead a § 1985(3) cause of action. The complaint does not mention a conspiracy and merely presents the broad allegation that defendant Colberg discharged plaintiff "with the advice and consent of defendant Hernández Agosto". For the foregoing reasons, the Court dismisses plaintiff's claim under 42 U.S.C. § 1985. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971); *Serrano Medina v. U.S.*, 709 F.2d 104, 106 (1st Cir.1983); *Fletcher v. Hook*, 446 F.2d 14, 15–16 (3d Cir.1971).

As to plaintiff's claim under 42 U.S.C. § 1983, this Court finds that the complaint

adequately constitutes the statement of a claim under the federal rules of pleading. F.R.C.P. 8(a). Furthermore, in the exercise of its discretion under F.R.C.P. 12(b), the Court chooses to exclude matters outside the pleading, thereby abstaining from considering the motion as one for summary judgment. Wright, Miller & Kane, Federal Practice and Procedure, § 2713. This action is taken in light of the forthcoming disposition of the matter under the affirmative defense of legislative immunity.

C. *Legislative Immunity:*

■ Defendants assert absolute immunity to plaintiff's suit for damages or injunctive relief under Sec. 1983 under the common law immunity accorded state legislators. The Supreme Court has clearly held that state legislators acting in a legislative capacity are absolutely immune from the imposition of injunctive remedies or civil damages in suits brought under 42 U.S.C. § 1983. *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 732–34, 100 S.Ct. 1967, 1974–76, 64 L.Ed.2d 641 (1980) (immunity from equitable remedies), *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (immunity from civil liability). Furthermore, legislative activities which otherwise are entitled to immunity in a 1983 suit do not lose the absolute protection of that immunity merely because such activities allegedly have violated a plaintiff's constitutional rights, *Colón Berríos v. Hernández Agosto,* 716 F.2d 85 (1st Cir.1983).

This immunity under Sec. 1983 was recognized to protect the integrity of the legislative process and not for the personal or private benefit of the members. The motive of the clause remains as a shield protecting the legislators from intimidation by other governmental authority, as well as from the time-consuming distractions of defending official legislative acts in Court. *See Tenney v. Brandhove, supra,* at 373–78, 71 S.Ct. at 786–89. Such protection allows the legislative function to be performed independently without fear of outside interference. *Supreme Court of Virginia, supra,* at 731, 100 S.Ct. at 1974.

The Sec. 1983 immunity enjoyed by state legislators, while originating in the common law of legislative immunity, has been placed on a parity with the constitutional immunity granted members of Congress under the Speech and Debate clause, Art. I, Sec. 6, Clause 1 of the U.S. Constitution. The two types of immunity have been compared for purposes of determining the scope of legislative activities subject to their protection. *Supreme Court of Virginia,* 446 U.S. at 733, 100 S.Ct. at 1975.

■ As was stated in the Magistrate's Report and Recommendation, the Speech and Debate clause protects "things generally done in session of the House by one of its members in relation to the business before it." *Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377 (1880) cited with approval in *United States v. Johnson,* 383 U.S. 169, 179, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966). In order to effectuate the purposes of the privilege, prior decisions have extended immunity under the Speech and Debate clause to matters beyond pure speech or debate in either House but "only when necessary to prevent indirect impairment of such deliberations," *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972), citing *United States v. Doe,* 455 F.2d 753, 760 (1st Cir.1972). That is, the immunity is available only when the legislative act at issue is "an integral part of the deliberative and communicative process by which members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States, supra,* at 625, 92 S.Ct. at 2627.

Decisions regarding the scope of § 1983 immunity protecting state legislators have been guided, but not necessarily determined, by the boundaries drawn for immunity under the clause. *See Agromayor v. Colberg,* 738 F.2d 55 (1st Cir.1984); *cert. denied,* — U.S. —, 105 S.Ct. 515, 83 L.Ed.2d 405 (1984). The § 1983 decisions

have characterized the legislators' privileged conduct as those acts undertaken "within the sphere of legitimate legislative activity" or within "a field where legislators traditionally have power to act." *Tenney v. Brandhove, supra,* at 376, 379, 71 S.Ct. at 788, 789; *Supreme Court of Virginia, supra* at 732–33, 100 S.Ct. at 1974–75.

▉ It is clear that not everything a legislator may regularly do in his official capacity is necessarily a legislative act qualifying for the immunity protection. In particular, the act of hiring or firing of legislative aides, assistants or staff personnel does not, in every case, receive immunity. The hiring or firing of an employee in a position which is only casually or incidentally related to the legislative process cannot be considered a legislative act entitled to immunity. *See, e.g., Walker v. Jones,* 733 F.2d 923 (D.C.Cir.1984) (the position of House restaurant manager has no "meaningful input" into the legislative function; thus discharge of this employee is not within protection of the Speech and Debate clause). Protection should be afforded a legislative decision to hire or fire only when the particular position at issue provides sufficient opportunity for meaningful input into the legislative process. *Agromayor v. Colberg, supra* at 60. *See Davis v. Passman,* 442 U.S. 228, 229, 249–50, 99 S.Ct. 2264, 2268, 2279–80, 60 L.Ed.2d 846 (1979).

▉ In this case, an inquiry limited to the statutory definition of plaintiff's post is sufficient to conclude that Mr. Lasa occupied a position which constitutes an integral element of the meaningful input necessary for the performance of defendants' legislative duty and for the general functioning of the legislative process. Title 2, Section 652 of the Laws of Puerto Rico creates the Office of Superintendent of the Capitol. Said provision clearly states in its pertinent part that "the Superintendent shall hold office at the discretion of the Presidents of both Bodies of the Legislature of Puerto Rico, who shall fix the remuneration for the position." This language is unequivocal and must be taken in its plain meaning. Plaintiff, as a politically-appointed employee, holds his position at the discretion of the Presidents of both Bodies of the legislature.

From the statute, it is clear that the Superintendent acts as an advisor and formulates plans for the implementation of broad goals. The statute provides that the Superintendent may seek the cooperation and advice of government agencies, an action which involves party affiliation. 2 L.P.R.A. § 653. Likewise, the functions, duties and powers of the Superintendent grant him control over the maintenance and development of the Capitol buildings and the financial planning, public appropriations and private contributions involved therein. 2 L.P.R.A. §§ 655, 656. He is also required to submit reports, plans and recommendations for the approval of the President of the Senate and Speaker of the House regarding such matters as acquisition of real property, conservation of energy, and public order and safety within the Capitol. 2 L.P.R.A. § 655.

In short, plaintiff is a political creature governed by Presidents of the two Legislative Bodies. His powers and functions revolve around politics; he is a confidential employee appointed by mutual agreement of both legislative bodies. With this in mind, the Court finds that defendants' discharge of Mr. Lasa was an act performed in furtherance of their legislative duties and is thus protected by legislative immunity.

Plaintiff's allegations of politically discriminatory discharge do not take into consideration the business of those that run the Government. We cannot lose sight of the political ideology and programs of the politicians in charge of Government. When there is a change in government, a new government is voted in to answer and respond to a pledged program of action. This program has been submitted to the people by the new political head, his political advisors and in general, his staff. The people voted for the program in an election and in a sense have ordered the politician to put into effect that program as an inher-

ent part of that election. The mandate given to the politicians by the people requires that those who are associated with the elected leader and who create and believe in the spirit of the program put the same into practice. Their public service would be markedly thwarted were they required to retain "those who hold steadfast to their claim in deliberate challenge to the electoral verdict." *Ramos Villanueva v. Cintrón, et al.*, No. R–81–137 (P.R., March 31, 1982), Justice Díaz Cruz, dissenting.[1] In sum, the new political leaders must have the freedom to substitute those who believe in the new program, and who will work towards the accomplishment of it.

The reason for the privilege which we uphold today is clear and deeply rooted in the United States system of government. In reference to the successful Parliamentary struggles of the sixteenth and seventeenth centuries to be independent from the Crown, Blackstone disclosed that the "(p)rivilege of parliament was principally established, in order to protect it's (sic) members not only from being molested by their fellow subjects, but also more especially from being oppressed by the power of the crown... These privileges however, which derogate from the common law, [are] only indulged to prevent the member's being diverted from the public business." 1 Blackstone, Commentaries on the Laws of England (1768), 159–60, *reprinted by* Dawsons of Pall Mall (1966). The legislators' immunity has been established, not for their good, but for the good of the people. The separation of powers, co-ordinated in their several functions, achieves a balance which ensures the political liberty of each citizen. *See* C. Montesquieu, The Spirit of Laws (1748), translated by T. Nugent, revised by J.V. Prichard, 38 Great Books of

the Western World 70 (1952). With reference to the prototype of the Speech & Debate Clause in our Federal Constitution, Blackstone observed:

> "As to privilege of speech, it is declared by the statute I W. & M. § 2. c. 2. as one of the liberties of the people, "that the freedom of speech, and debates, and proceedings in "parliament, ought not to be impeached or questioned in any court or place out of parliament."

1 W. Blackstone, Commentaries, *supra*, at 160 (emphasis supplied).

The application of the legislative privilege to the political and legal realities in this District of Puerto Rico stands in sharp contrast to the unrealized form of a similar privilege in the Spanish law of the last half of the 19th Century, during the time of the Spanish possession of Puerto Rico. Although commentators have recognized the influence of Montesquieu upon Spanish constitutional law, *e.g.*, 1 Nueva Enciclopedia Jurídica (1975) 384–85, the realities of Spanish government, both in Spain and Puerto Rico, revealed monarchic, rather than democratic ideals put into practice. The Constitutions of Spain, written in the 19th Century, present a system of lawmaking shared by the Crown and the Cortes, the latter a bicameral body composed of a Senate and a Congress of Deputies.[2] The Constitution, Art. 46, provided that the Senators and Deputies were "inviolable for their opinions and votes in exercise of their duties," Art. 46, Constitution of Spain, 1876, Documents on the Constitutional History of Puerto Rico (2d ed. 1964) 16. However, any privilege of independence from the Crown granted by these words was effectively nullified by the decisive role of the monarch in the composition and

---

1. *Ramos Villanueva* dealt with an *executive* decision to discharge a government employee. Although no immunity is accorded such executive decisions in suits for injunctive relief, *see Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), we find the policy supporting Justice Cruz' dissent particularly appropriate to a discussion of the merits of legislative immunity.

2. In the Constitution of 1876, the last of the Spanish Constitutions, the Senate was composed of royalty, royally-appointed noblemen, and officials elected by corporations of the state and the largest taxpayers. The Deputies were selected by electoral committees under the provisions of Article 27; each one represented 50,000 people. The Constitution of 1876 was extended to Puerto Rico by decree on April 2, 1881.

management of the Cortes and the provincial leaders.[3]

Thus, the people of Puerto Rico, in the 19th Century, along with those of Spain, knew little of "government by the people" as that system is defined in the United States Constitution and practiced in the organization of government which is the United States. It is this government which has been inherited and is now applied by the United States citizens living in Puerto Rico after 87 years of association with the United States, a period of time which represents nearly one-half the life of the United States. And it is this government which protects the rights of the people to self-government by providing to their elected legislators the privilege of immunity in the performance of legislative acts. The Puerto Rican cultural philosophy has been true to these Constitutional principles throughout its history of association with the United States.

The underpinning of the culture of the New World is essentially Greco-Roman, the culture prevailing in Europe at the time of the discovery of the Americas. Thereafter, the great experiment in democracy using a Republican form of government which is consecrated in the Constitution of the United States, gave rise to a practical cultural principle predicated on respect for the natural rights of men. The United States Constitution with its separation of powers protects such rights. The principle that ours is a government of laws and not of people has become second nature to every citizen of our Republic, including the citizens of this community.

It has been said that "there is no country in the world which can touch Spain in the matter of magnificent laws and there is no country in the world which can touch Spain in non-compliance with laws." Santiago Iglesias, Puerto Rico Resident Commissioner to Congress, *quoted in* H.K. Carroll, Report on the Island of Puerto Rico 723 (U.S. Gov't Printing Office, 1899). Whatever the truth of this statement, it is precise-

ly at the juncture of Spanish and U.S. involvement in 1898 that Puerto Rico adopted a culture based upon the U.S. Constitutional principles. Such Constitutional principles are so imbedded in the conscience and thinking of the people that they are conceived as articles of faith of their everyday life and an integral part of their culture and prevailing institutions. Indeed, the communal will of the people of Puerto Rico is buttressed by the principles of liberty and their corresponding obligations, such that Puerto Ricans, in defense of these principles have contributed together with their fellow citizens of the continent in the patriotic endeavor of two World Wars and other conflicts. Meanwhile, most of the other Latin American countries have been unconscious of this sacrifice and what it has meant in terms of preservation of our culture. Many of these countries have adopted a different culture devoid of the concept of a Government of laws and not of people.

This century's history shows that, in many of these countries which have failed to embrace a democratic way of life, citizens are subjected to violations of their civil rights, repeated revolutions with no relation to the welfare or will of the people, terror, mass assassinations and extreme poverty.

Puerto Rico's culture stands in contrast to that of Latin America. *See generally* Juan R. Torruella, The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal (1985). The community of Puerto Rico within the United States has learned to solve its political differences with great respect for the civil rights of the people by applying constitutional principles, as in this case where one of our pivotal concepts, the separation of powers, is at issue. Such principles are applied independently of any partisan political consideration because U.S. Judges have one and only client to which they are loyal: the Constitution and laws of the United States which they have sworn to uphold.

---

3. For a fuller discussion of the constitutional powers of the Spanish Crown by the late 19th

Century, see I J. Trias Monge, Historia Constitucional de Puerto Rico 68–73.

For all the above reasons, and in strict application of the Constitutional principles which are an integral part of our American culture, the Motion to Dismiss filed by the defendants is hereby GRANTED and Judgment is to be entered by the Clerk accordingly.

IT IS SO ORDERED.