**Jorge Hiram COLLAZO RIVERA, et al., Plaintiffs, Appellees,**

v.

**Hon. Jaime TORRES GAZTAMBIDE, et al., Defendants, Appellants.**

No. 86–1308.

United States Court of Appeals, First Circuit.

Argued Nov. 6, 1986.

Decided Feb. 25, 1987.

Marcos A. Ramirez, with whom Marcos A. Ramirez Lavandero, Hector Rivera Cruz, Secretary of Justice, and Ramirez & Ramirez, Hato Rey, P.R., were on brief, for appellants.

Frank Rodriguez-Garcia, Ponce, P.R., for appellees.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiff-appellee Jorge Hiram Collazo Rivera filed a civil rights suit in district court alleging that defendants-appellants Cosme Hernandez Silva and Jaime Torres Gaztambide violated the first and fourteenth amendments when they dismissed plaintiff from his government position. The district court granted plaintiff's request for a preliminary injunction, ordering that Collazo Rivera be reinstated. We reverse the grant of the preliminary injunction.

## I. BACKGROUND

In June 1981 Collazo Rivera was appointed Utuado District Regional Director of the Rural Housing Administration (RHA), an agency of the Puerto Rico Department of Housing. In January 1985 the Partido Popular Democratico (PPD), having won

the gubernatorial election, supplanted the Partido Nuevo Progresista (PNP), of which plaintiff was a member, as the party in control of the Commonwealth Administration.[1] On February 19, 1985, Hernandez Silva, Director of the RHA, transferred Jaime Barcelo, a PPD member, to take over plaintiff's functions as Regional Director, and on March 19, 1985, Hernandez Silva and Torres Gaztambide, the Secretary of the Department of Housing and a PPD member, notified plaintiff in writing that he had been replaced and his services would no longer be required.

Plaintiff brought suit in district court alleging that the firing violated his constitutional rights, and asking for damages and an injunction ordering his reinstatement as Regional Director with back pay. The district court held that the requirements for a preliminary injunction had been met; it ordered reinstatement and enjoined defendants from altering plaintiff's employment status on the basis of political affiliation pending a hearing and a determination on the request for a permanent injunction.

## II. STANDARD OF REVIEW

 We need not decide at this stage of the proceedings whether, as defendants urge, we must make an independent examination of the whole record under *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). This is not an appeal from a judgment on the merits. We are deciding only whether it was proper to issue a preliminary injunction. The appropriate standard for such review is abuse of discretion. *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 239 (1st Cir. 1986) (en banc); *see also De Choudens v. Government Development Bank of Puerto Rico*, 801 F.2d 5, 7 (1st Cir.1986) (en banc); *National Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 823 (1st Cir. 1979). We have described this standard as follows:

The decision to grant or deny a preliminary injunction is a matter for the discretion of the district court and is reversible, of course, only for an abuse of discretion. It is also well-settled, however, that the application of an improper legal standard in determining the likelihood of success on the merits is never within the district court's discretion. Similarly, misapplication of the law to particular facts is an abuse of discretion. In either of these circumstances, the denial of the preliminary injunction should be reversed and the injunction entered if necessary to protect the rights of the parties.

*Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981) (citations omitted) (quoting *Charles v. Carey*, 627 F.2d 772, 776 (7th Cir.1980), *appeal dismissed sub nom. Diamond v. Charles*, —— U.S. ——, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986)). We note also that because we are reviewing a preliminary injunction, "our 'conclusions' and 'holdings' as to the merits of the issue presented are to be understood as statements as to probable outcomes." *Jimenez Fuentes*, 807 F.2d at 239.

## III. THE PRELIMINARY INJUNCTION

 In this circuit there are four criteria that must be satisfied for a plaintiff to be entitled to a preliminary injunction:

The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the grant of the injunction.

*Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d at 1009 (quoting *Women's Community Health Center, Inc. v. Cohen*, 477 F.Supp. 542, 544 (D.Me.1979)). The district court held that all four criteria were met and granted plaintiff's request

---

**1.** One of the fundamental differences between the two parties is that the PNP seeks statehood and the PPD prefers autonomy under a commonwealth status.

for a preliminary injunction. We hold that plaintiff has not established the third criterion—a likelihood of success on the merits—because we find that party affiliation is an appropriate requirement for the Regional Director position and, therefore, it was permissible for the Administration to dismiss Collazo Rivera. If the court abused its discretion in making its decision on any criterion, we must reverse. *See Jimenez Fuentes*, 807 F.2d at 239. Thus, we have no cause to address the other criteria.

In our en banc opinion in *Jimenez Fuentes v. Torres Gaztambide*,[2] this court analyzed Supreme Court precedent, particularly *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and surveyed lower court interpretations of the law governing politically motivated discharges, to formulate a two-step inquiry for determining when a position is exempt from the prohibitions on firing someone for partisan political reasons. *Jimenez Fuentes*, 807 F.2d at 239–242. We noted that party loyalty is a permissible basis for selecting officials to fill certain positions on which the Administration relies for facilitating its programs and policies. *Id.* at 242. The first step in determining whether a particular position plays such a role is to ask if it "relates to 'partisan political interests . . . . [or] concerns.' That is, does the position involve government decisionmaking on issues where there is room for political disagreement on goals or their implementation? Otherwise stated, do party goals or programs affect the direction, pace, or quality of governance?" *Id.* at 242 (citation omitted) (quoting *Branti v. Finkel*, 445 U.S. at 519, 100 S.Ct. at 1295). The second step is to "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Jime-*

*nez Fuentes*, 807 F.2d at 242. Our function is "to weigh all relevant factors and make a common sense judgment in light of the fundamental purpose to be served." *Id.*

The district court held that "[o]ther than defendants' reliance on the fact that plaintiff's position is one of trust and confidence and the citing of some cases which the Court finds inapposite, there is no evidence the post entailed a degree of policy-making sufficient for political affiliation to qualify as an appropriate requirement." It found that there were "no responsibilities that may be even remotely considered of a policy-making nature." Our analysis of the Regional Director's functions in the light of the teaching of *Jimenez Fuentes* leads us to the opposite conclusion.

### A. Relationship to Partisan Political Concerns

Our first inquiry is whether the Regional Director position relates to partisan political concerns. In *Jimenez Fuentes*, we held that the Regional Director of the Puerto Rico Urban Development and Housing Corporation was such a position. 807 F.2d at 243–244. The Urban Development and Housing Corporation is a subgroup of the Department of Housing, responsible for providing housing in urban areas. The RHA is also a subgroup of the Department of Housing, responsible for administering housing programs in rural areas. The Regional Director implements RHA programs of significant economic and geopolitical impact. For instance, the RHA has the responsibility of distributing land to certain agricultural laborers (the *agregados*). *See* P.R. Laws Ann. tit. 28, §§ 521, 555 (1985). It administers programs to encourage family farm ownership and to distribute lots and construction materials to low-income families. *Id.* §§ 521, 711.

The RHA, therefore, administers important agrarian reform programs that impact on the fabric of Puerto Rico's rural life. The governing political party's ideological orientation on social and economic issues could affect the approach taken in carrying

---

**2.** The district court did not have the benefit of our en banc opinion at the time it decided this case.

out these programs. The position, therefore, is essentially similar to one involving "the provision of housing to low and middle income city residents[, which] is a vital political issue, at least as important to partisan program goals as the provision of water discussed in *Tomczak* [*v. City of Chicago*, 765 F.2d 633 (7th Cir.1985)]." *Jimenez Fuentes*, 807 F.2d at 243. In other words, it is a position in an agency rendering economic and social services of broad impact involving "government decisionmaking on issues where there is room for political disagreement on goals or their implementation[.]" *Id.* at 242. An official with regional authority to implement rural social and economic reforms could, because of political disagreement with the Administration over fundamental issues, hinder the accomplishment of the elected Administration's goals. We hold, therefore, that the RHA Regional Director position is substantially related to partisan political concerns.

### B. The Responsibilities of the Regional Director

Our second inquiry is into the particular responsibilities of the Regional Director to determine whether they entail policymaking, access to confidential information, communications, or similar functions for which party loyalty is an appropriate requirement. Our focus in this analysis is on the Regional Director's inherent powers, not the duties actually performed. The purpose of "this approach seems to be twofold: first, to resolve the issue entirely in one proceeding, thereby relieving the courts of the burden of having to reexamine a certain position every time a new administration changes the mix of responsibilities bestowed upon the officeholder; and, second, to provide certainty to litigants." *De Abadia v. Izquierdo Mora*, 792 F.2d 1187, 1192 (1st Cir.1986) (quoting *Tomczak v. City of Chicago*, 765 F.2d 633, 641 (7th Cir.1985)).

The job classification provided to the court lists the following duties of the RHA Regional Director:

1. Administering RHA activities at district level;

2. Attending meetings at the RHA central office to implement the land distribution program;

3. Orienting the officers and the community on the pertinent statutes and regulations;

4. Supervising and evaluating field work;

5. Filling out, investigating, and referring applications for parcels not awarded, left vacant, or obtained because of certain changes in ownership and configuration;

6. Organizing personnel training;

7. Coordinating RHA activities with municipal administrations;

8. Directing the investigation and verification of candidate lists for parcel distribution;

9. Handling complaints and making referrals to mayors, legislators, and community commissions;

10. Coordinating deed signing for the property granted in the district;

11. Coordinating and supervising surveying activity;

12. Evaluating work performance and submitting recommendations on personnel matters to the central office;

13. Serving as liaison between the RHA central office and other district-level agencies;

14. Drafting reports;

15. Offering recommendations for the improvement of RHA services to the executive director;

16. Representing the RHA in disputes concerning pertinent statutes, regulations, and rules;

17. Carrying out other assigned duties; and

18. Participating in a direct or delegated manner in the enactment of program rules and regulations, including "the enactment, modification and interpretation of [program] functions or in the direct coun-

seling of the [RHA] head influencing the public policy."[3]

These duties include implementing RHA programs, coordinating RHA activities with senior officials and other agencies and officials, and evaluating RHA policy and making recommendations for changes to it. They are very similar to the Regional Director's duties for which we found party loyalty to be an appropriate requirement in *Jimenez Fuentes*. *See Jimenez Fuentes*, 807 F.2d 244–245. Plaintiff argues, however, that the RHA Regional Director in fact has no discretion in performing the assigned functions. He directs our attention to the Norms and Procedures Handbook for the RHA, which contains detailed guidelines for the implementation of the parcel distribution program. The use of a detailed guidebook does not necessarily mean, however, that the position does not involve duties for which political affiliation is an appropriate requirement. Even if the procedures for carrying out the program are strictly circumscribed, there is still opportunity for affecting rural social and economic policies. As we said in *Jimenez Fuentes*, unless a regional director supports the agency's policies, the agency head " 'might face a situation where the hostile efforts or foot-dragging actions of any one of the [regional directors] could singlehandedly thwart the Administration's goals in that particular [region].' " 803 F.2d at 10 (quoting *Brunton v. United States*, 518 F.Supp. 223, 239 (S.D.Ohio 1981). "[P]olicy implementation is just as important as policymaking." *Branti v. Finkel*, 445 U.S. at 530, 100 S.Ct. at 1301 (Powell, J., dissenting), *quoted in Jimenez Fuentes*, 807 F.2d at 246. The Regional Director's duties offer considerable opportunity either to effectuate or to hinder the implementation of RHA programs and policies.

In *Jimenez Fuentes*, we found support for our conclusion that the Urban Development and Housing Corporation Regional Director was a position for which party loyalty was an appropriate requirement in the legislative classification of the position as one of "trust and confidence." 807 F.2d at 246–247. The RHA Regional Director is similarly classified. *See* L.P.R.A. tit. 3, § 1350 (1978). According to the statute, "[c]onfidential employees are those who intervene or collaborate substantially in the formulation of the public policy, who advise directly or render direct services to the head of the agency, such as ... [r]egional directors of agencies." *Id.* The district court did not find this classification significant in the context of its determination that there was no other evidence that the Regional Director had responsibilities of a policymaking nature. Although this legislative classification is not determinative in our examination of the Regional Director's responsibilities, the decision to include the individual in this position as one of the few "confidential employees" indicates that the position was viewed as entailing sensitive responsibilities. As we said in *Jimenez Fuentes*, "[w]ithin the agency at least, [plaintiff was] considered to be at the policymaking end of the spectrum." 807 F.2d at 247. We hold, therefore, that "party affiliation is an appropriate requirement for the effective performance" of the Regional Director position. *See Branti v. Finkel*, 445 U.S. at 518, 100 S.Ct. at 1294.

In light of the similarity between the RHA Regional Director's duties and those of the Urban Development and Housing Corporation Regional Director, the same conclusion is warranted in this case as in *Jimenez Fuentes*.

*The grant of the preliminary injunction is reversed. Remanded.*

---

**3.** Plaintiff contests the accuracy of the description in item eighteen, contending that he had not been aware of such duties and has never performed them. Plaintiff withdrew an objection to the authenticity of the document, but claims that item eighteen is only "ritual language" included to receive a certain job classification for the position. Because we are focusing on the inherent powers of the position, item eighteen is relevant even if it is not an accurate description of what plaintiff actually did. Moreover, even if this item were not truly the Regional Director's function, the rest of the duties listed are important enough to support the conclusion that the Administration may require party loyalty of the person responsible for their implementation.

Costs awarded to appellants.

TORRUELLA, Circuit Judge (Dissenting).

The majority opinion is another example of the growing tendency of this circuit, in Puerto Rico political discharge cases, to assume facts or possibilities that are not supported by the record. *Cf.* Rule 52(a), Fed.R.Civ.P.; *Anderson v. City of Bessemer, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Although the majority cites the *en banc* opinion in *Jiménez Fuentes v. Gaztambide, supra,* as authority for its ruling, a closer analysis of the present situation indicates that the applicable circuit precedent is *De Choudens v. Government Development Bank,* 801 F.2d 5 (1st Cir.1986) (en banc) (senior vice-president of the Puerto Rico Government Development Bank is not a position for which party affiliation is an appropriate requirement).

The first step in *Jiménez Fuentes'* two-pronged test for determining whether party affiliation is an appropriate requirement for the position in question [4] is, does the particular position "relate [ ] to partisan political interests ... [or] concerns. That is, does the position involve decision making on issues where there is room for political disagreement on goals or their implementation? Otherwise stated, do party goals or programs affect the direction, pace or quality of governance?" *Jiménez Fuentes,* 807 F.2d at 242.

As a basis for concluding that the RHA Regional director position is substantially related to partisan political concerns, the majority indicates, *ante* at 260, that:

> The RHA ... administers important agrarian reform programs that impact on the fabric of Puerto Rico's rural life. The governing political party's ideological orientation on social and economic issues *could* affect the approach taken in carrying out these programs.... An

official with regional authority to implement rural social and economic reforms *could,* because of political disagreement with the Administration over fundamental issues, hinder the accomplishment of the elected Administration's goals.

(Emphasis supplied). The above possibilities certainly do not come from the record. I have searched the record in vain for *any* factual support for these hypothetical conclusions. If a determination of the appropriateness of political affiliation is going to depend on a whole gamut of possibilities and speculations rather than on facts in the record, government employees are in a defenseless and indefensible position.

If the evidence were in the record, a comparison of the NPP's and PDP's official party platforms would demonstrate that after the expected rhetoric is set aside, there is surprisingly little difference in both party's "ideological orientation on social and economic issues," particularly as regards "important agrarian reform programs." There are substantial factions within *both* the NPP and the PDP who are affiliated to the National Democratic Party. The principal difference between the NPP and the PDP lies in their respective solutions to the question of how Puerto Rico's status should be resolved as relates to the United States. The NPP believes in statehood as the ultimate goal for Puerto Rico, while the PDP promotes an associated commonwealth.[5] Nevertheless, even assuming general ideological differences between these parties, there is *no evidence in this record* that there are *any* such differences regarding the administration of the programs handled by the RHA or plaintiff. The closest thing to this type of evidence in the record is the marginally-related testimony of appellant's "expert," Dr. Jack Hirshbrunner, evidence which was specifically rejected by the district court as not credible. *See* District Court opinion at 9–

---

**4.** *See Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

**5.** The exact meaning of this concept is yet to be fully defined. At least at present, commonwealth includes as its basis, permanent union

with the United States under the principles of "common citizenship, common defense, common currency, free market, [and] common loyalty to the values of democracy." 1 L.P.R.A. p. 151.

10. *See also Anderson v. Bessemer City,* 470 U.S. at 573–576, 105 S.Ct. at 1511–1513.

The majority's reference, *ante* at 261, to the RHA's statutory duties in the distribution of land,[6] as a basis for concluding that "the position involve[s] decision making on issues where there is room for political disagreement on goals or their implementation," is inapposite. The *record* establishes that these distributions are carried out by chance, that is, by raffle (*tómbola*), precisely to eliminate the possibility of discrimination, political or otherwise. *See also* 28 L.P.R.A. § 716. There is thus no political discretion to be exercised by the Regional Director in the execution of the principal *raison d'etre* of the RHA. Even without such a procedure, however, it would be most infelicitous if this court were to promote a patronage system that would encourage or facilitate the administration of social programs depending on the political affiliation of its recipients. Yet that is the predictable outcome of permitting the position of Regional Director to be filled by resorting to political hacks.

The majority's conclusion to the effect that "because of political disagreement with the Administration over fundamental issues," the regional director might be in a position to "hinder the accomplishment of the elected Administration's goal," wherefore, the position "is substantially related to partisan political concerns," *ante* at 261, reveals equally flawed reasoning. Such a situation basically describes a possible *Mt. Healthy*[7] scenario. If those facts were to develop, i.e., disloyalty or disruptive behavior by the employee against the Administration, irrespective of the employee's motivations appropriate disciplinary action, including dismissal, would be justified. A *Mt. Healthy* issue was in fact litigated and the district court ruled that the evidence was insufficient to support such a conclusion. *See* District Court opinion at pp. 7–8, 9–10. Merely because there is a *possibility* of disloyal actions by a subordinate, the position in question cannot be automatically converted into one for which political membership is appropriate. If

such were the test, political affiliation would be an appropriate requirement for the entire governmental hierarchy, as the *possibility* of disloyalty is always there. Yet that is not the law. *See Branti v. Finkel, supra.* As the district court indicated, "[t]he single answer to a non-proactive attitude is dismissal, but not for the employee's political beliefs." *Id.* at 10 (citations omitted).

In sum, the record does not support a finding to the effect that the RHA Regional Director position is substantially related to *partisan* political concerns, as is required by the first prong in *Jiménez Fuentes.*

Similarly, the record fails to support the majority's conclusion to the effect that the second *Jiménez Fuentes* test has been met. This test requires "examin[ing] the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Jiménez Fuentes,* 807 F.2d at 242.

The record shows, and the district court so found, "that there is no evidence the post entailed a degree of policy-making sufficient for political affiliation to qualify as an appropriate requirement." District Court opinion at 9. It found "no responsibilities that may be even remotely considered of a policy making nature." *Id.* On the record before us, the majority cannot conclude that the district court abused its discretion in issuing the injunction in this case, *Jiménez Fuentes,* 807 F.2d at 238. Neither is it free to ignore the district court's findings. *Cf. Anderson v. Bessemer City,* 470 U.S. at 573, 105 S.Ct. at 1511 ("a finding of intentional discrimination is a finding of fact").

None of the duties listed in the majority opinion, *ante* at 261, either individually or collectively can lead one to conclude that *party loyalty* should play any role in carrying out these duties. A reading of these duties reveals, at best, minimal policy input. Furthermore, there is nothing that can im-

---

6. 28 L.P.R.A. § 521, 555, 711 (1985).

7. *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

ply that the position is privy to confidential *information*.[8] There is no evidence in the record as to this.

. The fallacy in the majority's conclusion regarding appellee's position is readily seen when we compare his duties with those of the incumbent in the *De Choudens'* case. There we ruled *en banc* that the position of Senior Vice-President for the Finance Area of the Government Development Bank of Puerto Rico was not a position for which party affiliation was an appropriate requirement, despite holding that agency to be a politically sensitive one. Our ruling that de Choudens' position was non-political was made notwithstanding that she was "a staff official who, ... [held] a policymaking, confidential, and communicative position", "head[ed] one of the Bank's three main operations areas, the Finance Area", "was a member of the Bank's Loan Committee and sometimes acted as interim President", "gave advice to the President and the Board of Directors on financial matters within her area", and "was indeed an agency spokes-person." *De Choudens*, 801 F.2d at 9. If we ruled that de Choudens did not hold a political position in the face of those findings, I fail to see how we can rule otherwise in this case.

Because the majority usurps the fact-finding functions of the district court, and because this opinion will cause further confusion in an already disrupted jurisprudential area, I dissent.

---

**8.** The classification by the Puerto Rico Legislature of this position as being "confidential" 3 L.P.R.A. § 1350, implies only that its incumbent is a high ranking employee, not necessarily one who receives confidential *information*.