Julio Luis **RAMOS MATTA**, Plaintiff,

v.

Cirilo **TIRADO DELGADO**,
etc., Defendant.

Civ. No. 86–0403 (JP).

United States District Court,
D. Puerto Rico.

Sept. 10, 1987.

Pedro Miranda, San Juan, P.R., for plaintiff.

Antonio Fiol Matta, Federal Litigation Div., San Juan, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

This is a case arising under 42 U.S.C. section 1983, in which plaintiff alleges that he was discharged from his position as Regional Services Director for the State

Insurance Fund on the basis of his political affiliation. Plaintiff alleges that the rationale for his firing violated his first amendment rights to freedom of speech and association, and that the manner in which the firing was carried out violated his fifth and fourteenth amendment rights to be free from deprivation of property without due process of law.

The Court has before it defendants' motion for partial summary judgment as to any damages claim on the basis of qualified immunity. Based on the case law in this field, plaintiff's counsel has withdrawn any opposition to the motion for partial summary judgment, properly fulfilling its duty to the Court to not file motions unsupported by fact or law.

After the filing of defendants' motion for partial summary judgment, the law in the area of political discharge has been greatly simplified. In *Rosario Nevárez v. Torres Gaztambide*, 820 F.2d 525 (1st Cir.1987), the Court held that analysis of "inherent powers" in the position of Arecibo Regional Director for the Rural Housing Administration (RHA) obviated the need for any examination at trial of actual duties performed by plaintiff. *Rosario Nevárez*, 820 F.2d at 528 & n. 6 ("testimony at trial describing the duties he actually performed ... is irrelevant"). The analysis must be "on the Regional Director's inherent powers, not the duties actually performed." *Collazo Rivera v. Torres Gaztambide*, 812 F.2d 258, 261 (1st Cir.1987).[1] According to the uncontroverted personnel questionnaire form submitted by defendants, plaintiff's duties were

> Under the general supervision of the Administrator, but pretty much independently in his actions, develops and implements the policy to be followed in the Agency's regional services.
>
> 1. Plans, manages and supervises the activities of the regional services of the State Insurance Fund.

---

1. While this is actually the second part of the two-prong test of *Jiménez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 243–44 (1st Cir.1986) (en banc), *cert. denied*, — U.S. —, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987), the first prong, whether the position relates to partisan political concerns, was conceded by plaintiff when he withdrew any opposition to the summary judgment motion.

2. Supervises the rendering of services at the regional level to injured persons and employers, reviewing and rating on a continuous basis, the development of the activities at the different regional offices.

3. Participates along with the Administrator in the planning of work programs to be structured based on service goals assigned by the Compensation for Work Related Accidents Act to the Agency.

4. Attends to those matters of hard and complex nature brought daily before the Regional Directors regarding the compensation subprograms, insurance and medical, in due coordination with other areas of the Agency.

5. Coordinates with the regions and the Complementary Services Office the due implementation of new systems, procedures, guidelines and regulations in force at the Agency.

6. Offers top level counseling to the Administrator of the Agency on aspects related to the regional services programs.

7. Sees to the due integration of efforts at each region level and between the regions so as to insure the highest rendering of regional services.

8. Prepares regular and special reports on the progress of works, clearly underlining the most troublesome aspects in the performance of his high responsibility.

9. Keep close work relationship with the Planning and Rating Office on the statistical information received and analyzed by said Office regarding the development of the regional activities.

10. Keeps the Administrator and Deputy Administrator duly informed on the development of his tasks and the necessary actions at the level of other operational areas for the achievement of the work program being developed.

11. Attends by request from the Administrator or Deputy Administrator matters related to interagency efforts tangential to the Agency's service programs.

12. Determines the need of economic resources to develop the Unit's activities.

13. Identifies the training needs of the personnel under his supervision.

14. Selects, counsels and train and rates the newly-appointed personnel, as well as being responsible for the attendance, timeliness, discipline and efficiency thereof.

15. Participates in the direct attention to employers and injured persons bringing proposals to the Agency of administrative or technical nature.

16. Performs other duties as assigned by the Administrator.

■ As Regional Services Director for Humacao, plaintiff implemented policy, oversaw provision of services, coordinated programs with all of the other regions of the island, counseled the Administrator—his immediate supervisor—, and served as spokesman for the Administrator. In short, Ramos performed the entire panoply of tasks that have been recognized as requiring political affiliation to properly carry out insofar as they concern matters of partisan political concern. *Rosario Nevárez*, 820 F.2d at 528; *Collazo Rivera*, 812 F.2d at 262; *Jiménez Fuentes*, 807 F.2d at 244–45. As such, we are bound to abide by the conclusion that the Regional Services Director's "duties offer considerable opportunity to effectuate or to hinder the implementation of ... programs and policies" at the State Insurance Fund. *Rosario Nevárez*, 820 F.2d at 528; *Collazo Rivera*, 812 F.2d at 262. It was therefore proper for the Administrator to require party loyalty of the person responsible for implementing these sensitive functions. Not only on the request for qualified immunity, then, but rather on the merits, defendants' motion for summary judgment as to the first amendment claim is GRANTED.

■ Defendants also move for qualified immunity for damages resulting from plaintiff's fourteenth amendment right to due process. In order to have a protected property right, plaintiff must have a property interest. Property interests are created from sources outside the Constitution, such as state law. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494

(1985). Ramos' position as Regional Services Director was classified as one of trust and the record indicates that this status remained unchanged. Trust positions are of "free selection and removal" under Puerto Rico law, and this status does not endow the holder with a constitutionally protected property interest. *Laureano Agosto v. García Caraballo*, 731 F.2d 101 (1st Cir.1984), *affirming* No. 82–2481(JP) (D.P.R. June 3, 1983). Defendant's motion for summary judgment as to the procedural due process claim is GRANTED on the merits.

This result is the natural outgrowth of the law in this area, and the trend has been visible for some time. *See, e.g., Lasa v. Colberg*, 622 F.Supp. 557 (D.P.R.1985) (political affiliation an appropriate requirement for Superintendent of Capitol Building position). The path of the law to this point, however, has not been without several twists and turns. In 1982, the Supreme Court of Puerto Rico handed down its decision in *Ramos Villanueva v. Cintrón*, 112 D.P.R. 514 (P.R.1982), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). Plaintiff in that case was the Aguadilla Regional Director for the Department of Commerce. A member of the PDP, he was discharged after the change in administration after the 1976 general election. A member of the New Progressive Party replaced Ramos Villanueva. The *Ramos Villanueva* Court, affirming the Superior Court in Aguadilla, found that the discharge was politically motivated. Further, the Court stated, the government had failed to establish that political affiliation was an appropriate requirement for holding the Regional Director's post. Despite the high-level policy implementation and spokesperson functions Ramos was authorized to carry out, the Puerto Rico Supreme Court affirmed Ramos' reinstatement.

The Supreme Court of Puerto Rico embraced the seminal doctrine enunciated by the Supreme Court of the United States in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

If the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes. Under this line of analysis, unless the Government can demonstrate an "overriding interest of vital importance," requiring that a person's private beliefs conform to those of the hiring authority, his beliefs cannot be the sole basis for depriving him of continued public employment.

445 U.S. at 515, 100 S.Ct. at 1293 (citations omitted). In other words, if party affiliation is an appropriate requirement for the effective performance of the public office involved, then the new administration is within its right to dismiss and substitute the particular employee affiliated with the other political party.

The problem is not with the interpretation of the Constitutional principles pertaining to the first amendment. The three courts involved in this controversy, Supreme Court of Puerto Rico, United States District Court for the District of Puerto Rico, and the United States Court of Appeals for the First Circuit, all agree on the same interpretation and on the *Branti* reasoning. The recent reversals of this district by our appellate brethren in Boston are not the result of any derogation from our duty to uphold the Constitution and laws of the United States. As Oliver Wendell Holmes, Jr., observed, the law is nothing more than a prediction of what the courts will do.

The real problem arose when there was a change of administration in Puerto Rico as a result of the 1984 elections. The PDP came into power and started discharging office holders who were affiliates of the losing political party, the NPP. The U.S. District Court in Puerto Rico, citing what was, at the time, case law on point, followed the *Ramos Villanueva* court's analysis for positions similar to those in that Puerto Rico case. The result was that these types of executives were found protected by the first amendment and reinstated. This was a factual analysis, the methodology of which was designed to yield consistent results. The fact finding process is the most difficult. "The facts of

the case are generally more difficult to learn than the law. Attorneys and judges are schooled in the law. We either know the law or have the specialized technique to discover the law that applies. However, the facts continually change from case to case." Pieras, *Judicial Economy and Efficiency Through the Initial Scheduling Conference: The Method*, 35 Cath.U.L. Rev. 943, 945 (1986). Continued application of the factual analysis set forth by the Puerto Rico Supreme Court would tend to build a body of common law upon which the courts could rely with certitude. However, "[c]ertitude is not the test of certainty. We have been cocksure of many things that were not so."[2]

The First Circuit has refused to follow this analysis created by the Supreme Court of Puerto Rico, *i.e.*, that Regional Directors' offices do not require political party affiliation and, therefore, they could not be dismissed by the incoming political administration. On the contrary, the First Circuit has consistently found that such offices require political party affiliation and, therefore, the incoming PDP administration can discharge the Regional Director affiliates of the NPP. *Rosario Nevárez v. Torres Gaztambide*, 820 F.2d 525 (1st Cir. 1987) (Regional Director, Rural Housing Administration); *Pérez Quintana v. Gracia Anselmi*, 817 F.2d 891 (1st Cir.1987) (Regional Director, Right to Work Administration—ruling on qualified immunity); *Raffucci Alvarado v. Zayas*, 816 F.2d 818 (1st Cir.1987) (Regional Directors, Social Services Department—ruling on qualified immunity); *Mendez–Palou v. Rohena–Betancourt*, 813 F.2d 1255 (1st Cir.1987) (one plaintiff Regional Director, Department of Natural Resources—ruling on qualified immunity); *Collazo Rivera v. Torres Gaztambide*, 812 F.2d 258 (1st Cir.1987) (Regional Director, Rural Housing Administration—ruling on qualified immunity); *Rodríguez v. Muñoz*, 808 F.2d 138 (11th

Cir.1986) (Regional Director, Right to Work Administration—ruling on qualified immunity); *Jiménez Fuentes v. Torres Gaztambide*, 807 F.2d 236 (1st Cir.1986) (en banc) (Regional Directors, Corporación de Renovación Urbana y Vivienda—ruling on qualified immunity) *cert. denied*, —— U.S. ——, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987). *In effect, what the First Circuit has done is reverse the Supreme Court of Puerto Rico. Rodríguez*, 808 F.2d at 147 (Torruella, J., dissenting) ("This circuit is well on its way to creating a whole body of special jurisprudential exceptions just for Puerto Rican political discharge cases."); *Jiménez Fuentes*, 807 F.2d at 243 n. 9 (citing *Colón v. CRUV*, 115 D.P.R. 503 (P.R.1984) and noting "We respectfully disagree"); *id.* at 249 (Torruella, J., dissenting) ("The majority opinion reaches an opposite conclusion, regarding the same job classification and description, as was reached by ... the Supreme Court of Puerto Rico") (emphasis not included); *De Abadía v. Izquierdo Mora*, 792 F.2d 1187, 1206–07 (1st Cir.1986) (Torruella, J., dissenting).

We believe that at the time of Ramos Matta's discharge, May 1985, the law was settled and well stated that persons occupying positions with duties like those of the Regional Director in this case were protected from politically motivated discharge. *Ramos Villanueva v. Cintrón*, 112 D.P.R. 512 (P.R.1982), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). There would, therefore, be no right to qualified immunity. The United States Court of Appeals, however, has changed tack and the factual methodology. In view of controlling precedent for this Court, the decisions in *Rosario Nevárez, Pérez Quintana, Raffucci Alvarado, Monge–Vázquez, Collazo Rivera, Rodríguez, Jiménez Fuentes*, and *De Abadía*, we are contrite to follow. The net practical result, however, has been that the PDP and its close ally in national poli-

---

**2.** The passage, again from Mr. Justice Holmes, continues. "But while one's experience thus makes certain preferences dogmatic for oneself, recognition of how they came to be so leaves one able to see that others, poor souls, may be equally dogmatic about something else." Holmes, *Natural Law*, 32 Harv.L.Rev. 40, 41 (1918). This hermeneutical exercise can be especially useful when watching the impact of federal constitutional law upon the political life of Puerto Rico. *See*, J. Torruella, The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal (1985).

tics, the Kennedy Wing of the National Democratic Party, have won a great advantage in the patronage field resulting in their entrenchment in Puerto Rico. *See Agosto v. Aponte Roque,* 631 F.Supp. 1082, 1095–96 & nn. 4–5 (D.P.R.1986), *aff'd in part,* No. 86–1300 (1st Cir. Aug. 14, 1987). Under Puerto Rico Supreme Court cases, the new NPP administration was saddled with politically hostile and powerful bureaucrats after the 1976 general elections. After the NPP lost power in 1984, the new PDP Administration undertook a testing of the case law and new civil service statutes and regulations in the federal courts. The result of that testing is that every Regional Director since examined has been found amenable to discharge for political reasons. Under case law developed by the First Circuit, then, the PDP is now free to politically appoint and discharge many more government employees than the preceding administration.

Nevertheless, we feel at ease with the reversal of the factual analysis conducted by the Supreme Court of Puerto Rico in the *Ramos Villanueva* case. As a matter of fact, we thought, with reservations, that the dissent in that case was better reasoned.

Plaintiff's allegation of politically discriminatory discharge do not take into consideration the business of those that run the government. We cannot loose sight of the political ideology and programs of the politicians in charge of government. When there is a change in government, a new government is voted in to answer and respond to a pledged program of action. This program has been submitted to the people by the new political head, his political advisors and in general, his staff. The people voted for a program in the election and in a sense have ordered the politicians to put into effect that program as an inherent part of that election. The mandate given to the politicians by the people requires that those who are associated with the elected leader and who create and believe in the spirit of the program put the same into practice. Their public service would be markedly thwarted were they required to retain "those who hold steadfast to their chair in deliberate challenge to the electoral verdict".

*Lasa v. Colberg,* 622 F.Supp. 557, 560–61 & n. 1 (D.P.R.1985) (per Pieras, J.), *quoting Ramos Villanueva,* 115 D.P.R. at 658 (Díaz Cruz, J., dissenting). "In sum, the new political leaders must have the freedom to substitute those who believe in the new program, and who will work towards the accomplishment of it." *Lasa,* 622 F.Supp. at 561.

The case is DISMISSED.

The Clerk shall enter Judgment accordingly.

IT IS SO ORDERED.