Maria M. AGOSTO, et al., Plaintiff,

v.

Awilda APONTE ROQUE,
et al., Defendant.

Civ. No. 85–0916 (JP).

United States District Court,
D. Puerto Rico.

Aug. 6, 1992.

Héctor Urgell Cuebas, Urgell, Miranda & Feijoo, San Juan, Puerto Rico, Frank Rodríguez García, Ponce, Puerto Rico, for plaintiff.

Lisa E. Bhatia Gautier, Saldaña, Rey & Alvarado, Santurce, Puerto Rico, for defendant.

## OPINION & ORDER

PIERAS, District Judge.

The Court has before it plaintiffs' Motion Requesting Judgment dated August 22, 1990, and defendants Motion for Dismissal of All Claims dated September 11, 1990, as well as supplemental briefs filed by both sides. For the reasons set out below, plaintiffs' motion is hereby GRANTED and defendants' motion is hereby DENIED.

## I. Factual and Procedural Background

The material facts controlling this case are set forth in detail in the Opinion & Order issued by this Court on March 19, 1986. *Agosto v. Aponte Roque*, 631 F.Supp. 1082, 1083–1092 (D.Puerto Rico (1986). A brief summary of the facts is nonetheless essential in understanding the issues now before the Court. All five plaintiffs, María M. Agosto, Luz M. Camacho, Virginia Díaz, Vicente Vázquez Castro, and Miguel A. Vega, were career public employees of the Department of Education of the Commonwealth of Puerto Rico for between twenty-two (22) and thirty two (32) years. Defendant María Scott Morales is, and was at the time of the actions which gave rise to plaintiffs' complaint, the Regional Director of the Humacao Region of the Puerto Rico Department of Education. She was appointed to the position on January 14, 1985, two weeks after Governor Rafael Hernández Colón, the leader of the Popular Democratic Party, took office. Governor Hernández had succeeded former Governor Carlos Romero Barceló of the rival New Progressive Party. All five plaintiffs are members of the New Progressive Party.

Within four days of her appointment, defendant Scott had taken away the majority of the duties and responsibilities held by each of the plaintiffs, assigning these duties to personnel in the region who were in subordinate positions to plaintiffs but who were members of the Popular Democratic Party. Plaintiffs were not consulted prior to the taking away of their duties. When plaintiffs asked defendant Scott for the reason for her action, she told them that the Popular Democratic Party had won the election and that changes were therefore required in the region. At trial, all plaintiffs testified that they had been relieved of their duties solely because of their political affiliation. Defendant Scott, who was present during the entire trial and testified, presented no other justification for her conduct.

As a result of the reorientation of duties, plaintiff Agosto, who as Assistant Regional Director had varied supervisory and other responsibilities, was left with severely limited duties. She was made to appear as a mere assistant rather than Assistant Director of the Region, and for all practical purposes to be an employee who was demoted. Plaintiff Díaz, who as a General Supervisor for School Services had been assigned varied supervisory and managerial tasks, was left having to ask Scott for permission to use a telephone, to make photocopies, or to have typing done. She appeared as an individual whose duties had been purposefully taken away to show that she was no longer in command and that her stature had been diminished because her political party had lost the election. Plaintiff Camacho, who as a General Supervisor of School Services had also been assigned varied supervisory and managerial duties, was left without any supervisory authority and with the responsibility of overseeing a program for which she had an inadequate background. Plaintiff Vázquez, who as a General Supervisor of School Services had broad responsibilities relating to personnel, curriculum, and budget, was left responsible only for the school transportation program. Plaintiff Vega was also a General Supervisor of School Services who had

been a Regional Coordinator involved in, among other things, the coordination of personnel in the region. He failed to prove that substantial changes in his tasks had been caused by defendants.

Defendants presented several arguments at trial. They challenged plaintiffs' assertion that the changes in their duties were politically motivated. Defendant Scott argued that the positions held by plaintiffs were always subject to reshaping by her predecessors and that she should be allowed the same flexibility. She argued that the responsibilities retained by plaintiffs were substantial. She stated that she was in the midst of determining the needs of the region and that when a complete analysis had been made, she would begin adding functions pertinent to the positions held by plaintiffs.

After a bench trial, this Court found in favor of all plaintiffs except Vega, holding that they had set forth a prima facie case of political discrimination and that defendants had failed to present a credible non-discriminatory justification for their actions. Injunctive relief was granted in the form of reinstatement. Compensatory and punitive damages were also awarded. Defendants had never raised the defense of qualified immunity.

Defendants appealed on four grounds: (i) failure to state a claim under the First and Fourteenth amendments, (ii) qualified immunity, (iii) clearly erroneous factual findings, (iv) excessive damage awards, and (v) overly broad injunctive relief. The First Circuit addressed only defendants' first ground for appeal—that plaintiffs had failed to state a claim under the First and Fourteenth amendments for political discrimination—although it addressed this issue in considerable detail. The question presented to the court was whether protections provided to public employees terminated as a result of political discrimination which were recognized by the Supreme Court in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), should be available to "government employees whose

employment, while not terminated, was subjected to less advantageous conditions and responsibilities because of the employees' political affiliation." *Agosto v. Aponte–de–Feliciano*, 889 F.2d 1209, 1212. The court answered this question in the affirmative and proceeded to set forth a series of guidelines for determining the types of conduct short of termination that are actionable. The court remanded the case for reconsideration of the facts in light of the newly enunciated standard.

On January 17, 1990, this Court ordered the parties to submit any additional information they wished to present to the Court prior to its reconsideration. Defendants responded by requesting a stay of these proceedings pending the outcome of *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), a Supreme Court case which considered, in light of the prior decisions in *Elrod* and *Branti*, the constitutionality of several related political patronage practices, including promotion, transfer, recall, and hiring after layoff. A stay of these proceedings was granted on February 2, 1990. On June 21, 1990, the Supreme Court rendered its decision in *Rutan*, holding that the patronage practices at issue, unless "narrowly tailored to further vital government interests ... impermissibly encroach on First Amendment freedoms." *Rutan*, 497 U.S. at ——, 110 S.Ct. at 2736, 111 L.Ed.2d at 66. The Court, balancing the First Amendment interests of individual government workers and of an incoming administration, found:

> [O]ur conclusions in *Elrod*, supra, and *Branti*, supra, are equally applicable to the patronage practices at issue here. A government's interest in securing effective employees can be met by discharging, demoting or transferring staffmembers whose work is deficient. A government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views. Likewise, the 'preservation of the democratic process' is no more furthered by the patronage promotions, transfers, and

rehires at issue here than it is by patronage dismissals.

*Id.,* 497 U.S. at ——, 110 S.Ct. at 2737, 111 L.Ed.2d at 66.

Following the issuance of the decision in *Rutan,* plaintiffs filed, on August 22, 1990, their Motion Requesting Judgment, in which they asked this Court to reaffirm its decision based on the First Circuit's opinion in this case, which they assert, and the Court agrees, was not altered by *Rutan.* Defendants responded by filing, on September 11, 1990, a Motion for Dismissal of All Claims. Defendants also argued that *Rutan* had no effect on the First Circuit's opinion in this case, but argued that the First Circuit's calculus directed a finding in defendants' favor. On November 27, 1991, the Court held a hearing to accept additional evidence and argumentation on the issues raised in the parties' cross motions.[1]

## II. Discussion

In addressing the issues presented by the appeals in this case, the circuit court endeavored not to consider the specific questions presented in this case but to set forth an analytical framework to be applied in all cases of alleged political discrimination in which plaintiffs complain of action short of termination. The court sought to provide the district courts with a mechanism to assist them in "sift[ing] out the chaff of minor irritants and frustrations from the wheat of truly significant adverse actions." *Agosto–de–Feliciano,* 889 F.2d at 1214.

This mechanism is "a standard for evaluating employee burdens that protects against at least some politically motivated actions short of discharge, but that also gives due breadth to the government's interest in the effective implementation of its policies." *Id.* at 1215. The mechanism reflects the standard analysis in civil rights cases, with certain refinements.

Plaintiffs must first set forth a prima facie case of political discrimination by showing (a) by a preponderance of the evidence, that the diminution in their duties was motivated by discrimination based on political affiliation,[2] *and* (b) by clear and convincing evidence, that the challenged actions resulted in a work situation "unreasonably inferior" to the norm for the position. *Id.,* at 1218–20. The circuit court provided some guidance in applying the "unreasonably inferior" prong of the prima facie analysis. For example, the court suggested that a determination should be made as to whether "the government's actions are sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party." *Id.* at 1217; *see also id.* at 1218 (describing control group as comprising persons "of thick skin"). The bulk of the court's guidance, however, came in the form of illustrations of hypothetical situations in which the court felt that infractions may or may not be deemed to have occurred. These illustrations are summarized in the margin.[3]

---

**1.** Following the hearing, the Court granted the parties an opportunity to file supplemental memoranda of law in which they could address several issues left unresolved by the information presented to the Court in the hearing.

**2.** Defendants have not directly challenged the Court's finding that their actions were motivated by discriminatory animus; therefore, the Court will not reconsider this issue.

**3.** The court suggested that a cause of action exists where: (i) an employee with previously exciting or responsible work is left with only a few routine or technical assignments; (ii) an employee's job functions remain the same but the employee is excluded from policymaking sessions that he once attended; (iii) an employee with prior supervisory responsibilities and significant independence in the carrying out of his or her duties loses *both* freedom to work independently *and* supervisory status; (iv) an employee retains his or her job but is criticized harshly on a nearly daily basis, never provided guidance on *how to improve, transferred to* undesirable office space, and whose requests for assistance are spurned.

The court suggested that no cause of action exists where: (i) an employee has lost mere "perks" of position, *i.e.,* best office or secretary or unlimited telephone access; (ii) an employee has suffered substantial narrowing of his or her job but has retained supervisory authority over matters of comparable significance; (iii) an employee is left with less-exciting work but had received such responsibilities because he was the political ally of the former supervisor or had some other idiosyncratic relationship with him; (iv) an employee is given one or two short-term assignments that are below his or her rank.

Defendants' central contention in the motions now before the Court is that plaintiffs failed to make the required prima facie showing because they failed to show that the reduction of duties resulted in a work situation unreasonably inferior to the norm for the position. Their argument proceeds as follows. The evidence adduced at trial "showed that there was no regulation or equivalent document attaching a specific set or level of duties for the positions of general supervisors held by plaintiffs." Defendants' Pre–Hearing Brief at 12. In the absence of any such regulations, the Court characterized the duties performed by plaintiffs prior to defendant Scott's arrival as the proper ones for the position. The Court must re-evaluate these characterizations based on the one of the illustrations set forth by the circuit court, in which it suggested that a plaintiff has adequately shown unreasonably inferior conditions if he establishes that he had previously responsible work and was left with only a few routine tasks, but *only* "so long as his prior duties reflected the usual nature of his position rather than his prior high status as a member of the then-prevailing party." *Agosto–de–Feliciano*, 889 F.2d at 1219.[4]

Defendants argue vigorously that "[t]he evidence presented in this case established precisely that the duties assigned to plaintiffs by former Regional Director Mr. Vega did not represent the norm for the position but Mr. Vega's own choices for distributing the available tasks among the various general supervisors, a choice that favored plaintiffs, members of the then governing party." Defendants' Pre–Hearing Brief at 13. They direct the Court's attention to testimony provided by defendants at trial from which they believe it can be inferred that many of plaintiffs' duties were accumulated because of their relationship with Vega.

If the evidence had in fact showed that plaintiffs lost privileges they had enjoyed solely because of their relationship with Vega, defendants would be entitled to the inference they seek. The evidence does not bear out this contention, however. The testimony defendants rely upon simply was not credible. As a result, the Court was left without any reliable evidence of "the history of the job at issue." 889 F.2d at 1220.[5] The circuit court recognized that district courts might face such a problem and stated that in cases where "there [is] no stable prior job history to serve as a

---

**4.** The centerpiece of defendants' argument is their contention that the Court's characterization of the duties normally assigned to the positions held by plaintiffs was inappropriate. They have also challenged, however, the notion that plaintiffs were employees who enjoyed previously responsible work and were left with only a few routine tasks, thereby yielding an "unreasonably inferior" position. They have sought to bring again before the Court the facts relating to each of the plaintiffs and the duties which they retained after the arrival of defendant Scott in an effort to have the Court re-examine those findings of fact which led the Court to conclude that the changes effectuated by the incoming administration were severe.

After reviewing defendants' version of the facts, the Court again rejects their position. The evidence at trial clearly established that the duties retained by plaintiffs after the arrival of defendant Scott, to the extent any significant duties were retained at all, were not appropriate to individuals in plaintiffs' positions. The Court therefore declines to alter its conclusion that the changes in job duties suffered by plaintiffs were extremely drastic. 631 F.Supp. at 1087.

In addition, the Court notes that the circuit court opinion does not appear to direct this

Court to re-examine its factual findings. Instead, the opinion appears to direct this Court to (i) make additional findings of fact to the extent required to apply the standards set forth by the circuit court, and (ii) reevaluate the conclusions it drew from its findings of fact using the calculus set forth by the circuit court. Nowhere does the opinion suggest that the findings of fact previously made by this Court are somehow infirm and subject to re-examination based on the circuit court's new legal standard.

**5.** Defendants submitted for the Court's consideration an undated memorandum purporting to summarize the responsibilities of the General Supervisors (as of an unspecified date) and a 1987 Department of Education manual of personnel duties; however, neither document presents reliable evidence on which the Court could determine the established duties normally assigned to an individual occupying plaintiffs' positions. Plaintiffs also presented material for the Court's consideration, but the Court finds that none of the documents warrant a change in the Court's original conclusions as the nature of the positions held by plaintiffs.

standard ... the fact-finder will be able to examine only the change in the particular employee's working conditions to determine whether the 'new' job is unreasonably inferior to the one she previously had." *Id.*[6] The Court took precisely this course of action. And in the absence of any additional reliable evidence from which the Court might have drawn conclusions about the duties associated with plaintiffs' positions, the Court finds itself without the ability nor the desire to alter its findings as to the duties proper held by individuals occupying plaintiffs' positions. As a result, and after considering all of the standards and illustrations set forth by the First Circuit, the Court also (i) declines to alter its conclusion that the changes in job duties suffered by plaintiffs were "extremely drastic" (631 F.Supp. at 1087), leaving each of them in positions unreasonably inferior to the norm and (ii) declines to alter its conclusion that plaintiffs set out a prima facie case of political discrimination.

■ Defendants may, following the mechanism created by the circuit court, seek to establish by a preponderance of the evidence that the diminution in responsibilities would have occurred regardless of plaintiffs' political affiliation. *Id.* at 1220 (citing *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Cordero v. De Jesús Méndez*, 867 F.2d 1, 5 (1st Cir. 1989); *Kercadó Meléndez v. Aponte Roque*, 829 F.2d 255, 264 (1st Cir.1987)) (valid examples include showing that (i) plaintiff's performance unsatisfactory; (ii) elimination of duties resulted from unavoidable budget cuts; or (iii) most employees in relevant unit, regardless of political affiliation, experienced reduction in duties). Defendants

have not endeavored to make such a showing of an alternative, non-discriminatory reason for their actions in this case, however.

■ Defendants may nonetheless attempt to avail themselves of the "changeover" defense, which recognizes that certain actions taken soon after the changeover of administration may be designed not to discriminate against plaintiffs but to advance the new administration's First Amendment related interests in implementing its policies. *Id.* at 1209. In *Agosto–de–Feliciano*, the circuit court noted that although the government has the burden of proof in establishing this defense its burden is relaxed because of the deference that should be given to its explanation of how the changes fit into its overall policy objectives. The court also noted that the defense is stronger where the position is politically sensitive.

■ Defendants have made considerable efforts to cast their actions in the protective light of the changeover defense. They argue:

> In exercising the First Amendment interest in implementing the policy represented by the incoming Popular Democratic Party, an interest fully recognized by the Court of Appeals, Mrs. Scott had the right to channel the efforts of the office in a manner consistent with *her* perceptions of the policies of the new administration she had to implement, while all the studies required to assess the needs of the region were carried out.

Defendants' Pre–Hearing Brief at 16 (emphasis added). Defendants' argument fails for several reasons. As described by the First Circuit, the changeover defense has two aspects. First, it recognizes the right

---

**6.** If defendants could have proved that the region had been designed so that the Regional Director would be afforded "the flexibility to determine the areas in which [she] assigns one or more supervisors according to the central policies, the needs of the region, and the resources available," the Court would have been presented with a troubling situation. If, in fact, the duties assigned to plaintiffs were as flexible as defendants contend, so that the incoming administration had unfettered freedom to reassign the various duties held by plaintiffs, *Rutan*

and *Agosto–de–Feliciano* would appear to provide no protection to plaintiffs. The Court would have been unable to find that any particular set of duties were normally held by plaintiffs and would have therefore been unable to find that any such duties were taken away.

The Court need not address whether plaintiffs operating in such a system would be protected, however, since the Court rejects defendants' contention that such a system controlled the duties held by plaintiffs.

of an incoming administration to reorganize the structure of departments, to readjust departmental priorities, and to initiate new procedures to carry out its functions. 889 F.2d at 1221. It thus accepts the fact that a changeover in administrations is "likely to produce substantial alterations in certain employees' jobs not because those employees are members of the outgoing party but because the incoming party, *as a matter of policy*, does not view those jobs to be important." *Id.* (emphasis in original). For example, if defendant Scott had, soon after her arrival, reorganized the region to streamline costs and in the process eliminated several of the positions held by plaintiffs, she could have used this aspect of the changeover defense to justify her action; however, where, as here, an incoming administration does not eliminate jobs but instead merely removes duties from one set of employees and gives them to another, the changeover defense provides no protection.[7]

The second aspect of the changeover defense "assumes that the new administration may, at times, feel the need to assign duties deemed especially critical to its political philosophy to employees who share that philosophy." *Id.* Such a shift of duties is proper, however, only where the incoming administration "can show a reasonable basis for believing that such an employee would likely be more helpful in implementing the new policies than an employee who is a member of an opposing political party." *Id.* (noting that factfinder should give some deference to the government's explanation of its needs). In cases implicating this prong of the defense, "the factfinder must look specifically at the duties in question to determine whether they concern politically sensitive matters." *Id.* at 1221; *see also Rutan*, 497 U.S. at –– – ––, 110 S.Ct. at 2736–37, 111 L.Ed. at 65–66 (citations omitted) (government interest in securing employees who will loyally implement its policies is valid but can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views); *Monks v. Marlinga*, 923 F.2d 423 (6th Cir.1991) (citations omitted) ("In addressing whether a job is a policy-making position, this court held that the 'relevant focus of analysis is the inherent duties of the position in question, not the work actually performed by the person who happens to occupy the office.' "); *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982) ("The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decision making on issues where there is room for principled disagreement on goals or their implementation.")

Defendants have not mounted a particularly aggressive attack based on this aspect of the changeover defense.[8] Although de-

---

7. Even assuming *arguendo* that the defense provides protection for such actions, it only does so where the new administration can point to stated policies which the actions were designed to advance. *See* 889 F.2d at 1221–22 (in evaluating a changeover defense the factfinder should take into account whether the actions occurred precipitately or after some opportunity for appraisal, whether they were connected to previously announced goals, and whether they flowed from a procedural or organizational study). Defendant Scott has asserted that she relied on her own "perceptions" of the policies of the new administration. As a preliminary matter, since defendant Scott does not present the new *administration's* "explanation of how changes made shortly after it assumed power fit into its overall policy objectives" (889 F.2d at 1221), her justifications are entitled to little if any deference. Furthermore, if by stating that she relied on her own perceptions she means that she relied on her own unstated opinions about the needs of the region—the First Amendment related interests of which she has not explained—such opinions are insufficient to support a changeover defense. To the extent that she relied on certain conditions in the region that she felt needed to be addressed immediately, these conditions implicated primarily efficiency concerns which did not justify the actions taken. Finally, to the extent she feels that the changeover defense provided her with the freedom to take whatever actions she desired as long as she did so soon after assuming control of the region, she misperceives the nature of the defense. *Accord* 889 F.2d at 1222 ("drastic changes in job duties and conditions occurring early in the life of an administration may not be made entirely free of political constitutional liability.")

8. During the hearing held in this case, the Court specifically inquired as to whether defendants contend that plaintiffs held sensitive policy-

fendant Scott referred to the individuals who assumed the duties formerly performed by plaintiffs as her "confidence committee," the evidence showed that plaintiffs were career employees and that their positions could not be classified as "trust" or policymaking positions. Without proof that the positions held by plaintiffs were politically-sensitive positions, defendants fail to establish the most basic element of this aspect of the changeover defense.

■ As a result, the Court reaffirms its finding that defendants have failed to rebut plaintiffs' prima facie showing by either presenting an alternative, non-discriminatory reason for the actions taken or establishing a valid defense to their actions.[9] The Court once again finds that defendants effectuated a severe and politically-motivated change in plaintiffs' work conditions which imposed a substantial burden on their right to free association and that this right was not outweighed by the government's interest in effectively implementing its policies. Plaintiffs' Motion Requesting Judgment is therefore GRANTED and the prior Judgment of this Court is REAFFIRMED.[10]

IT IS SO ORDERED.

---

making positions. Defendants asked for, and were granted, an opportunity to address this question in a supplemental memorandum of law. The memorandum of law that was submitted did not, however, address this issue in any way.

9. Had defendants brought forth such evidence, plaintiffs would have been allowed the opportu-

nity to demonstrate that the asserted justification was simply a pretext. 889 F.2d at 1209.

10. Plaintiffs Vázquez and Díaz need not be reinstated, since the former has died and the latter has retired since the onset of this case. The other two prevailing plaintiffs, Agosto and Camacho must be immediately reinstated as ordered.